[Cite as *State v. Frost*, 2019-Ohio-3540.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2018-11-023 |
| | : | O P I N I O N |
| - vs - | | 9/3/2019 |
| | : | |
| JOSHUA E. FROST, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. CRI 20180174


Jess C. Weade, Fayette County Prosecuting Attorney, Fayette County Courthouse, 110 East Court Street,1st Floor, Washington Court House, Ohio 43160, for appellee

Steven H. Eckstein, 1208 Bramble Avenue, Washington Court House, Ohio 43160, for appellant



**S. POWELL, P.J.**

{¶ 1} Appellant, Joshua E. Frost, appeals his conviction in the Fayette County Court of Common Pleas after a jury found him guilty of one count of disrupting public services. For the reasons outlined below, we affirm.

{¶ 2} On May 4, 2018, the Fayette County Grand Jury returned an indictment charging Frost with one count of disrupting public services in violation of R.C. 2909.04(A)(1),

a fourth-degree felony in accordance with R.C. 2909.04(C).[1]  Pursuant to R.C. 2909.04(A)(1), no person, "purposely by any means or knowingly by damaging or tampering with any property," shall interrupt or impair:

> television, radio, telephone, telegraph, or other mass communications service; police, fire, or other public service communications; radar, loran, radio, or other electronic aids to air or marine navigation or communications; or amateur or citizens band radio communications being used for public service or emergency communications[.]

For purposes of the disrupting public services statute, R.C. 2909.04(A), the term "impair" means "'to make worse' or 'diminish in quantity, value, excellence, or strength.'" *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 36, quoting Webster's Third New International Dictionary (1986) 1131.  "[T]he destruction of a private telephone or cellular telephone constitutes damaging or tampering with property under R.C. 2909.04(A)." *Id.* at ¶ 29.

{¶ 3}  The charge stemmed from a physical altercation between Frost and his girlfriend that took place in Frost's Fayette County residence.  During this altercation, it was alleged Frost prevented his girlfriend from calling 9-1-1 by grabbing his girlfriend's telephone out of her hand and slapping her in the face.  After denying Frost's motion to suppress, the matter proceeded to a one-day jury trial.  Following deliberations, the jury returned a verdict finding Frost guilty as charged.  Upon being found guilty, the trial court sentenced Frost to a 14-month prison term.  Frost now appeals his conviction, raising nine assignments of error for review.

{¶ 4}  Assignment of Error No. 1:

{¶ 5}  THE TRIAL COURT ERRED IN DENYING DEFENDANT-APPELLANT'S

---

1. Frost was also charged with one count of domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor in accordance with R.C. 2919.25(D)(2).  That charge was later dismissed.

MOTION TO SUPPRESS IN VIOLATION OF HIS RIGHTS UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 14 OF THE OHIO CONSTITUTION.

{¶ 6} In his first assignment of error, Frost challenges the trial court's decision denying his motion to suppress. In support, Frost argues the trial court erred by finding he was not subject to a custodial interrogation when questioned by police regarding the 9-1-1 hang-up call originating from his residence. We disagree.

{¶ 7} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 15, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence to resolve factual questions and evaluate witness credibility. *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 8. Therefore, when reviewing the denial of a motion to suppress, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Durham*, 12th Dist. Warren No. CA2013-03-023, 2013-Ohio-4764, ¶ 14. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12.

{¶ 8} Two witnesses testified at the suppression hearing: Frost and Officer John Warnecke, a patrolman with the Washington Court House Police Department. Officer Warnecke testified that he was dispatched to Frost's residence on a report of a "hang up 911 call" where a woman was heard "saying that she needed help." It was reported that the woman's call for help was followed shortly thereafter by sounds of "a male in the

background" forcibly taking the telephone away from the woman just prior to the call being disconnected. This type of call, as Officer Warnecke testified, is given top priority because of the unknown danger involved "so we have to assume that there was some type of reason for someone to call 911." There is no dispute that the woman who called 9-1-1 was Frost's girlfriend. There is also no dispute Frost's girlfriend called 9-1-1 from Frost's residence.

{¶ 9} Approximately three minutes after the 9-1-1 hang-up call was made, Officer Warnecke arrived at Frost's residence. Upon his arrival, Officer Warnecke observed Frost exiting his residence and walking through the front yard towards his truck. Seeing Frost walking towards his truck, Officer Warnecke contacted Frost and asked him "if there was a problem." Frost responded by stating "no it was just a misunderstanding and that he needed to leave for work." However, due to the nature of the call, Officer Warnecke told Frost that he needed to stay at the scene until he could "figure out if a crime had occurred or not." Frost's response to Officer Warnecke's instruction was "slightly argumentative." But, although Frost appeared somewhat hesitant to comply with Officer Warnecke's directive, Officer Warnecke testified Frost nevertheless "voluntarily went back inside the residence."

{¶ 10} Officer Warnecke testified that upon entering Frost's residence, he watched as Frost immediately went up the stairs and "started screaming" at his girlfriend "telling her that nothing had happened[.]" Hearing the commotion upstairs, Officer Warnecke followed Frost up the stairs and observed Frost again "yelling" at his girlfriend telling "her that nothing had happened[.]" Officer Warnecke testified that he believed it best to speak with Frost's girlfriend privately, so he instructed Frost to go back downstairs and wait with Sergeant Kevin Shoopman, who had since arrived at the scene. According to Officer Warnecke, Frost complied with his instructions to go back downstairs and wait with Sergeant Shoopman.

{¶ 11} , Officer Warnecke testified that once Frost was back downstairs he spoke to Frost's girlfriend about the 9-1-1 hang-up call. As Officer Warnecke testified, this was to investigate the matter and determine why Frost's girlfriend had called 9-1-1 for help. During this conversation, Frost's girlfriend told Officer Warnecke that she called 9-1-1 because Frost had become "violent with her." Explaining further, Frost's girlfriend told Officer Warnecke that "while she was speaking with 911 that Mr. Frost removed the phone from her hands in an effort to stop her from calling 911." Officer Warnecke testified that while he was speaking with Frost's girlfriend, Frost continued to yell up the stairs to his girlfriend that "nothing had happened."

{¶ 12} After speaking with Frost's girlfriend, Officer Warnecke went downstairs to speak with Frost. Frost, who was standing with his back towards the front door, was not handcuffed at this time. Upon approaching Frost at the bottom of the stairs, Officer Warnecke told Frost what his girlfriend had relayed during the conversation upstairs. Officer Warnecke testified that after Frost heard what his girlfriend had said, he then asked Frost "what had happened." Frost responded and admitted that he and his girlfriend "were in a slight physical altercation." Frost, however, told Officer Warnecke that it was his girlfriend who was the aggressor so he "slapped towards her in an effort to get her away from him." Frost also told Warnecke that "he had tried to prevent [his girlfriend] from calling 911 because he didn't want the police involved in the matter."

{¶ 13} After speaking with Frost, Officer Warnecke placed Frost under arrest and put him in handcuffs. Officer Warnecke testified that once Frost was placed in handcuffs, Frost began shouting racial slurs at the officers. Officer Warnecke also testified that Frost told both officers that he was going to "assault" them and "stated multiple times that we should watch our backs because he was in a gang and then started hitting his head on the partition in our vehicle." Officer Warnecke further testified that Frost told him that "he wished he

would have beat that bitch's ass."  There is no dispute that Frost was not notified of his *Miranda* rights prior to Officer Warnecke placing him under arrest.  This was because, according to Officer Warnecke, Frost was not yet in custody because he was still "attempting to figure out what had happened."

{¶ 14} Frost then testified.  Similar to Officer Warnecke's testimony, Frost testified Officer Warnecke approached him in front of his residence while he was getting into his truck to go to work.  As Officer Warnecke approached, Frost testified Officer Warnecke contacted him and informed him that he had been dispatched to the scene to investigate a 9-1-1 hang-up call that had originated from his residence.  Upon being so informed, Frost testified that he told Officer Warnecke that he did not know that a 9-1-1 call had been made but that "nothing was going on for the police to be there."  Frost testified Officer Warnecke then instructed him to get out of his truck and asked him who was inside his residence.  Frost responded that his girlfriend was inside.  Frost testified Officer Warnecke then "more or less" just walked him towards his residence and, once inside, told him to sit on the couch.  Frost testified that during this time he did not feel that he was free to leave.

{¶ 15} Frost testified that after he sat down on the couch, Officer Warnecke went upstairs and spoke to his girlfriend.  Frost testified that after speaking to his girlfriend, Officer Warnecke came back downstairs and "just told [him] what [his girlfriend] said and told [him] he was under arrest."  Frost testified that upon being told he was under arrest, he attempted to tell Officer Warnecke his side of the story.  But, according to Frost, Officer Warnecke was not interested in hearing anything he had to say since he had already "told him outside that nothing was going on so that I had already told him[.]"  When asked if Officer Warnecke asked him any questions while inside the residence either before or after Officer Warnecke went upstairs to speak with his girlfriend, Frost testified "No.  Nope. * * * He just told me what [my girlfriend] said and told me I was under arrest."

{¶ 16} After hearing closing arguments from both parties, the trial court issued a decision denying Frost's motion to suppress. In so holding, the trial court found it "pretty clear" that Frost was not in custody when speaking to either Officer Warnecke or Sergeant Shoopman, thereby alleviating the need for either Officer Warnecke or Sergeant Shoopman to advise Frost of his *Miranda* rights. *See State v. Fridley*, 12th Dist. Clermont No. CA2016-05-030, 2017-Ohio-4368, ¶ 35 ("duty to advise a suspect of constitutional rights pursuant to *Miranda* is only required when the police subject a person to a custodial interrogation"). Frost disputes the trial court's finding. However, after a review of the record, we find no error in the trial court's decision. This is because, as discussed more fully below, Frost was never interrogated by Officer Warnecke or Sergeant Shoopman nor was Frost in custody when speaking to either Officer Warnecke or Sergeant Shoopman prior to Officer Warnecke placing Frost under arrest.

{¶ 17} The issuance of *Miranda* warnings is only required when police subject a person to custodial interrogation. *State v. Byrne*, 12th Dist. Butler Nos. CA2007-11-268 and CA2007-11-269, 2008-Ohio-4311, ¶ 10, citing *State v. Biros*, 78 Ohio St.3d 426, 440 (1997). "Encompassed in this definition are two distinct concepts: custody and interrogation." *State v. Staley*, 12th Dist. Madison No. CA99-08-019, 2000 Ohio App. LEXIS 1939, *8 (May 8, 2000). An interrogation includes "express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, ¶ 20 (2d Dist.), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682 (1980). An interrogation, "as conceptualized in *Miranda*, must reflect a measure of compulsion above and beyond that inherent in custody itself" before it will be considered a custodial interrogation. *State v. Brumley*, 12th Dist. Butler No. CA2004-05-114, 2005-Ohio-5768, ¶ 10.

{¶ 18} The only challenged statements are those Frost made in response to Officer Warnecke asking him (1) "if there was a problem" shortly after Officer Warnecke arrived at the scene and (2) "what had happened" after Officer Warnecke came back downstairs after speaking with Frost's girlfriend. However, contrary to Frost's claim, these questions were nothing more than on-the-scene questioning used to determine what had prompted Frost's girlfriend to call 9-1-1. "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process ordinarily does not fall within the ambit of custodial interrogation." *State v. Rivera-Carrillo*, 12th Dist. Butler No. CA2001-03-054, 2002-Ohio-1013, ¶ 17, citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602 (1966). "That is because such general questioning is only an attempt to elicit basic facts relative to the officer's investigation." *State v. Barrett*, 12th Dist. Butler No. CA2003-10-261, 2004-Ohio-5530, ¶ 32. Therefore, because Officer Warnecke's questioning of Frost was merely a part of his investigation into the 9-1-1 hang-up call, Frost was not subject to an interrogation.

{¶ 19} Moreover, even if Officer Warnecke's questioning of Frost could be considered an interrogation, the record is clear that Frost was not in custody at any time prior to when Officer Warnecke placed him under arrest. "*Miranda* defines custodial interrogation as any 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of any action in any significant way.'" (Emphasis omitted.) *State v. Matthews*, 12th Dist. Butler No. CA2012-09-175, 2013-Ohio-3482, ¶ 10, quoting *Miranda*, 384 U.S. at 444. The determination of whether a custodial interrogation has occurred "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *State v. Coleman*, 12th Dist. Butler No. CA2001-10-241, 2002-Ohio-2068, ¶ 24, citing *Stansbury v. California*, 511 U.S. 318, 323-324, 114 S.Ct. 1526

(1994). Therefore, "[i]n judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995), quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980).

{¶ 20} As noted above, Officer Warnecke questioned Frost just twice: (1) a short distance outside his residence while Frost was walking to his truck and then (2) immediately inside the front door to Frost's residence. The record indicates Frost was not handcuffed when Officer Warnecke questioned him on either occasion. The record also indicates that neither Officer Warnecke nor Sergeant Shoopman made any threats to Frost, nor did Officer Warnecke or Sergeant Shoopman do anything that would be considered physically intimidating towards Frost. The record further indicates that Officer Warnecke and Sergeant Shoopman did not attempt to overpower, trick, or coerce Frost in any way.

{¶ 21} The record instead indicates Officer Warnecke and Sergeant Shoopman were calm and were "just trying to figure out what had happened." Therefore, just as the trial court found, it is "pretty clear" that Frost was not in custody when speaking to either Officer Warnecke or Sergeant Shoopman. This is true even though Officer Warnecke testified Frost was not free to leave. *See, e.g., State v. C.J.*, 12th Dist. Warren No. CA2017-06-082, 2018-Ohio-1258, ¶ 29 (appellant was not in custody even though "officer testified that appellant would not have been 'free to go' during the questioning, that was simply because the officer wanted to get appellant's side of the story").

{¶ 22} It is only when both custody and an interrogation are present that "law enforcement officers must advise an individual of his constitutional rights to [ensure] that self-incriminating statements made by that individual are the result of free choice." *Rivera-Carrillo*, 2002-Ohio-1013 at ¶ 10, citing *Miranda*, 384 U.S. at 457. Because Frost was neither interrogated nor in custody prior to Officer Warnecke placing him under arrest, the

trial court did not err by denying Frost's motion to suppress. *See, e.g., State v. Santiago*, 9th Dist. Lorain No. 01CA007798, 2002 Ohio App. LEXIS 1063, *11-12 (Mar. 12, 2002) (appellant not subject to a custodial interrogation when appellant told officers responding to a 9-1-1 hang-up call that he had just killed his girlfriend when asked "what happened" that prompted the call to 9-1-1 be made); *State v. Tyler*, 7th Dist. Belmont No. 1244, 1978 Ohio App. LEXIS 9652, *7-8 (July 12, 1978) (appellant not subject to a custodial interrogation when asked "what happened" by the first officer to arrive at the scene of a fatal shooting). Therefore, finding no merit to any of the arguments raised herein, Frost's first assignment of error lacks merit and is overruled.

{¶ 23} Assignment of Error No. 2:

{¶ 24} TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE DURING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

{¶ 25} In his second assignment of error, Frost argues he received ineffective assistance of counsel when his trial counsel failed to "ask about a warrant, exigent circumstances, or the cessation of the exigent circumstances" at the hearing on his motion to suppress. However, even if Frost's trial counsel had raised these arguments, such arguments would have been futile and would not have resulted in the trial court granting the motion to suppress. *See, e.g., State v. Jones*, 12th Dist. Brown No. CA2015-05-014, 2016-Ohio-67, ¶ 13 (exigent circumstances placed a duty on responding officers to briefly enter appellant's home to investigate an alleged accidental 9-1-1 "pocket call" to determine whether an emergency actually existed); *State v. Hunter*, 2d Dist. Montgomery No. 24350, 2011-Ohio-6321, ¶ 18 ("[a] hang-up 9-1-1 call creates a circumstance where a reasonable

investigation can be made"). "The failure to raise a meritless argument does not constitute ineffective assistance of counsel." *State v. Hawkins*, 10th Dist. Franklin No. 15AP-35, 2016-Ohio-1404, ¶ 106. Therefore, because Frost did not receive ineffective assistance of counsel at the suppression hearing, Frost's second assignment of error lacks merit and is overruled.

{¶ 26} Assignment of Error No. 3:

{¶ 27} THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION TO REPRESENT HIMSELF IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.

{¶ 28} In his third assignment of error, Frost argues the trial court erred by denying his request to terminate assigned counsel and proceed pro se at trial. Frost, however, made his request for self-representation immediately after the trial court overruled his motion to suppress and a mere ten minutes prior to the time his jury trial was scheduled to begin.[2] "A trial court may deny a defendant's request for self-representation if it is untimely made." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 76. Such is the case here. *See, e.g., State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 38 (appellant's request for self-representation three days before the trial was untimely); *State v. Buchanan*, 8th Dist. Cuyahoga No. 104500, 2017-Ohio-1361, ¶ 18 (appellant's "day-of-trial verbal request for self-representation was not unequivocal or timely"). "[A] trial court may predicate 'its decision solely on the timing of appellant's request.'" *State v. Degenero*, 11th Dist. Trumbull No. 2015-T-0104, 2016-Ohio-8514, ¶ 14, quoting *State v. Deir*, 11th Dist. Lake No. 2005-L-117, 2006-Ohio-6885, ¶ 34.

---

2. We note that immediately after overruling Frost's motion to suppress the trial court called for a recess and stated, "we're going to take about a ten-minute break and we'll start with the trial."

{¶ 29} Regardless, even if we were to assume Frost made his request for self-representation timely, we find no merit to Frost's claim that he made his request both clear and unequivocally. A request for self-representation is not unequivocal if it is a "momentary caprice," the result of "thinking out loud," or the result of "frustration." (Internal quotation marks omitted.) *State v. Beamo*, 12th Dist. Butler No. CA2018-04-065, 2019-Ohio-443, ¶ 13, citing *Neyland*, 2014-Ohio-1914 at ¶ 73, quoting *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir.1990), quoting *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir.1989), citing *Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir.1991). "Nor is a request unequivocal if it is 'an emotional response.'" *State v. Steele*, 155 Ohio App.3d 659, 2003-Ohio-7103, ¶ 13 (1st Dist.), quoting *Lacy v. Lewis*, 123 F. Supp. 2d 533, 548 (C.D.Cal.2000).

{¶ 30} As noted above, Frost made his request for self-representation immediately after the trial court overruled his motion to suppress and a mere ten minutes prior to the time his jury trial was scheduled to begin. Under these circumstances, we find it clear that Frost was merely expressing frustration with the fact that his motion to suppress had been overruled just moments before. That is to say Frost's request for self-representation "was the product of an emotional response to the situation" and not a clear and unequivocal request for self-representation. *State v. Jones*, 4th Dist. Athens No. 14CA7, 2014-Ohio-5177, ¶ 18. Had that been the case Frost would not have so easily acquiesced to his assigned counsel representing him at trial just ten minutes later. *See Cassano*, 2002-Ohio-3751 at ¶ 42 (appellant "abandoned any intention to represent himself when he did not pursue the issue of self-representation after the court told him it would not be a good idea"). Therefore, finding no merit to Frost's claims raised herein, Frost's third assignment of error lacks merit and is overruled.

{¶ 31} Assignment of Error No. 4:

{¶ 32} THE TRIAL COURT ERRED IN AMENDING THE INDICTMENT DURING

TRIAL IN VIOLATION OF DEFENDANT-APPELLANT'S RIGHTS TO DUE PROCESS OF LAW, A FAIR TRIAL, JURY UNANIMITY, AND THE DOUBLE JEOPARDY PROTECTIONS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION; CRIM.R. 31(A).

{¶ 33} In his fourth assignment of error, Frost argues the trial court committed reversible error by permitting the state to amend the indictment to include the phrase "being used for public service or emergency communications" when the relevant portion of the disrupting public services statute, R.C. 2909.04(A)(1), describes only "police, fire, or other public service communications."  While we agree with Frost's claim that the trial court erred in its interpretation of that provision of the disrupting public services statute, as discussed more fully below, we find such error was harmless in that Frost can demonstrate no resulting prejudice therefrom.

{¶ 34} As noted above, R.C. 2909.04(A)(1) provides that no person, "purposely by any means or knowingly by damaging or tampering with any property," shall interrupt or impair:

> television, radio, telephone, telegraph, or other mass communications service; police, fire, or other public service communications; radar, loran, radio, or other electronic aids to air or marine navigation or communications; or amateur or citizens band radio communications being used for public service or emergency communications[.]

{¶ 35} Frost's argument is essentially one of statutory construction.  "The primary goal of statutory construction is to ascertain and give effect to the legislature's intent in enacting the statute."  *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, ¶ 9.  To that end, "[w]here the meaning of the statute is clear and definite, it must be applied as written."  *State v. Kormos*, 12th Dist. Clermont No. CA2011-08-059, 2012-Ohio-3128, ¶ 14, citing *Bailey v.*

*Republic Engineered Steels, Inc.*, 91 Ohio St.3d 38, 40 (2001). "'However, where a statute is found to be subject to various interpretations, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent.'" *State v. Waggoner*, 12th Dist. Butler No. CA2013-02-027, 2013-Ohio-5204, ¶ 9, quoting *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 96 (1991). Therefore, when interpreting a statute, the threshold question is whether the statute at issue is ambiguous. *State ex rel. Beavercreek Twp. Fiscal Officer v. Graff*, 154 Ohio St.3d 166, 2018-Ohio-3749, ¶ 15, citing *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, ¶ 8.

{¶ 36} Just as the Ohio Supreme Court found when interpreting Section (A)(3) of the disrupting public services statute, *see Robinson*, 2009-Ohio-5937 at ¶ 19, we find the language set forth in R.C. 2909.04(A)(1) is also plain and unambiguous in that the phrase "being used for public service or emergency communications" applies only to amateur or citizens band radio communications. This is because, rather than using commas as the General Assembly had done previously, the General Assembly now uses semicolons to separate the listed forms of communications set forth therein.[3] It is well-established that "[t]he placement of commas matters, and it can change the meaning of a sentence." *State v. Hart*, 2d Dist. Montgomery No. 26517, 2016-Ohio-317, ¶ 12; *State v. Wilmoth*, 22 Ohio St.3d 251, 270 (1986) (Sweeny, J., dissenting) ("[i]t is common knowledge that one word such as 'no' or 'not,' or a misplaced comma, can completely change the meaning or effect of any particular phrase or sentence"). So too would the placement of semicolons rather than commas; semicolons denote separate and distinct elements or thoughts, whereas

---

3. The General Assembly amended R.C. 2909.04(A)(1) through the enactment of 1999 Ohio H.B. 137 which had an effective date of March 10, 2000.

commas are used to separate items in a series or list.[4]

**{¶ 37}** It is well-established that when the General Assembly amends a statute that the General Assembly "'intended to change the effect and operation of the law to the extent of the change in the language thereof.'" *State ex rel. Mager v. State Teachers Ret. Sys. of Ohio*, 123 Ohio St.3d 195, 2009-Ohio-4908, ¶ 23, quoting *Greenville Law Library Assn. v. Ansonia*, 33 Ohio St.2d 3, 6 (1973); and *Malone v. Indus. Comm.*, 140 Ohio St. 292, 299 (1942). Therefore, contrary to the trial court's interpretation, we agree with Frost's claim that the plain and unambiguous language found in R.C. 2909.04(A)(1) sets forth the General Assembly's intent to apply the phrase "being used for public service or emergency communications" only to amateur or citizens band radio communications rather than to all of the forms of communication listed therein.

**{¶ 38}** However, although we find error in the trial court's interpretation of R.C. 2909.04(A)(1), we find that such error was harmless in that the amendment approved by the trial court did not *remove* an element of the offense. The amendment instead *added* an additional element that the state was required to prove. That is to say the amendment required the state to prove not only that Frost (1) "purposely by any means or knowingly by damaging or tampering with any property," (2) interrupted or impaired (3) his girlfriend's telephone, but that Frost did so (4) while her phone was "being used for public service or emergency communications." Therefore, because the challenged amendment added an additional element to the offense, Frost cannot demonstrate any resulting prejudice therefrom. *See, e.g., State v. Short*, 12th Dist. Butler No. CA2010-12-322, 2011-Ohio-5744, ¶ 38 (appellant not prejudiced by the trial court instructing the jury on a "simpler definition

---

4. A semicolon is defined as "'a mark of punctuation (;) indicating a degree of separation greater than that marked by a comma and less than that marked by a period: used chiefly to separate units that contain elements separated by commas, and to separate closely related coordinate clauses.'" *Lindsay v. Garfield Heights*, 8th Dist. Cuyahoga Nos. 107230 and 107236, 2019-Ohio-1359, ¶ 25, quoting *Webster's New World Dictionary* 1220 (1994).

of self-defense" where appellant's requested instruction would have required appellant to "prove two additional elements").

{¶ 39} Pursuant to Crim.R. 7(D), a trial court may amend a complaint "at any time before, during, or after a trial "provided no change is made in the name or identity of the crime charged." The challenged amendment in this case did not change the name or the identity of the offense. This is because, as noted above, the name of the offense, the penalty of the offense, and the degree of the offense all remained the same both before and after the amendment. *See State v. Hensley*, 12th Dist. Warren No. CA2009-11-156, 2010-Ohio-3822, ¶ 13 ("to determine whether the "identity" of the offense is changed, we must determine whether the amended indictment changed the 'penalty or degree' thereof"). Therefore, finding no reversible error herein, Frost's fourth assignment of error lacks merit and is overruled.

{¶ 40} Assignment of Error No. 5:

{¶ 41} THE TRIAL COURT MISSTATED THE LAW IN ITS JURY INSTRUCTIONS THEREBY DEPRIVING DEFENDANT-APPELLANT OF HIS RIGHT TO A FAIR TRIAL BEFORE A PROPERLY INSTRUCTED JURY, AND OF HIS RIGHT TO DUE PROCESS OF LAW, AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

{¶ 42} In his fifth assignment of error, Frost argues the trial court also committed reversible error by including within its jury instructions the phrase "being used for public service or emergency communications" when setting forth the relevant portion of the disrupting public services statute, R.C. 2909.04(A)(1). However, based on our holding in Frost's fourth assignment of error above, we find any error the trial court may have made was, at worst, harmless. Therefore, again finding no reversible error herein, Frost's fifth

assignment of error also lacks merit and is overruled.

{¶ 43} Assignment of Error No. 6:

{¶ 44} DEFENDANT-APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 1 AND 10, OF THE OHIO CONSTITUTION.

{¶ 45} In his sixth assignment of error, Frost argues he received ineffective assistance of counsel when his trial counsel failed to object to the trial court including the phrase "being used for public service or emergency communications" within its jury instructions.  However, based on our holding in Frost's fourth and fifth assignments of error discussed above, we find no merit to Frost's ineffective assistance of counsel claim.  Frost must prove both (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that his counsel's deficient performance prejudiced him to the point of depriving him of a fair trial in order to prevail on an ineffective assistance of counsel claim. *State v. Setty*, 12th Dist. Clermont Nos. CA2013-06-049 and CA2013-06-050, 2014-Ohio-2340, ¶ 58, citing *Strickland v. Washington*, 466 U.S. 687-688, 104 S.Ct. 2052 (1984).  But, as noted above, Frost suffered no prejudice by the trial court including the phrase "being used for public service or emergency communications" within its jury instructions.  Therefore, finding no merit to any of the arguments raised herein, Frost's sixth assignment of error lacks merit and is overruled.

{¶ 46} Assignment of Error No. 7:

{¶ 47} THE TRIAL COURT ERRED IN DENYING DEFENDANT-APPELLANT'S CRIM.R. 29 MOTION FOR ACQUITTAL AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO CONCLUDE THAT GUILT HAD BEEN PROVEN BEYOND A REASONABLE DOUBT IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND A FAIR

- 17 -

TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶ 48} Assignment of Error No. 8:

{¶ 49} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY BECAUSE SUCH VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

{¶ 50} In his seventh and eighth assignments of error, Frost argues his conviction must be reversed because it was not supported by sufficient evidence and was against the manifest weight of the evidence. Frost, however, readily acknowledges that this case hinged on Officer Warnecke and Sergeant Shoopman's testimony against his own. This court should not, and will not, disturb the jury's findings in regard to which version of events was credible and which was not. *State v. Bonner*, 12th Dist. Butler No. CA2012-09-195, 2013-Ohio-3670, ¶ 13. The mere fact the jury believed the evidence presented by the state over Frost's own testimony does not equate to a finding that the jury clearly lost its way so as to render his conviction against the manifest weight of the evidence. *State v. Rogers*, 12th Dist. Butler No. CA2017-08-112, 2018-Ohio-1356, ¶ 40. This is true even though Frost testified on his own behalf and claimed both Officer Warnecke and Sergeant Shoopman were lying. "The jury was free to believe some, none or all of the testimony of the officers." *State v. Gordon*, 12th Dist. Preble No. CA99-12-022, 2000 Ohio App. LEXIS 4798, *11 (Oct. 16, 2000).

{¶ 51} "[T]he destruction of even a single telephone may constitute a disruption of telephone service, which includes the initiation of telephone calls." *State v. White*, 2d Dist. Montgomery No. 21795, 2007-Ohio-5671, ¶ 10. The state in this case provided more than

enough evidence to prove beyond a reasonable doubt that Frost prevented his girlfriend from calling 9-1-1 by grabbing her telephone out of her hand and slapping her in the face. If believed, Frost's conduct falls squarely within the types of behaviors that the statute was designed to punish. *See, e.g., James*, 2017-Ohio-7861 at ¶ 76-84 (conviction affirmed where appellant broke victim's cell phone which "prevented [her] from calling police or seeking emergency assistance until she could escape from the apartment"). Given its guilty verdict, the jury clearly found the state's evidence credible whereas Frost's evidence submitted in his defense was not. Therefore, because Frost's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence, Frost's seventh and eighth assignments of error lack merit and are overruled.

{¶ 52} Assignment of Error No. 9:

{¶ 53} THE TRIAL COURT ERRED BY IMPOSING A DEFINITE PRISON SENTENCE UNDER R.C. 2929.14 FOR A FELONY OF THE FOURTH DEGREE THAT MET ALL OF THE REQUIREMENTS OF R.C. 2929.13(B)(1)(a) AND ONLY ONE OF THE EXCEPTIONS OF R.C. 2929.13(B)(1)(b).

{¶ 54} In his ninth assignment of error, Frost argues the trial court erred by sentencing him to serve 14 months in prison rather than imposing a period of community control. We disagree.

{¶ 55} "R.C. 2929.13(B)(1)(a) sets forth a presumption for community control if an offender is convicted of or pleads guilty to a felony of the fourth or fifth degree that is not an offense of violence." *State v. Napier*, 12th Dist. Clermont No. CA2016-04-022, 2017-Ohio-246, ¶ 44. The trial court, however, has discretion to impose a prison term if any of the exceptions listed in R.C. 2929.13(B)(1)(b) apply. *State v. Lilly*, 12th Dist. Clermont Nos. CA2017-06-029 and CA2017-06-030, 2018-Ohio-1014, ¶ 15; *see, e.g., State v. Kinsworthy*, 12th Dist. Warren CA2013-06-053, 2014-Ohio-1584, ¶ 85 (trial court acted within its

- 19 -

discretion by imposing a prison sentence rather than a period of community control where one of the exceptions found in R.C. 2929.13[B][1][b] applied). One of those exceptions exists where the "offender violated a term of the conditions of bond as set by the court." R.C. 2929.13(B)(1)(b)(iii).

{¶ 56} Here, the record is clear that Frost violated the conditions of his bond by testing positive for methamphetamines on the day of trial. Frost admits the same as part of his appellate brief. Therefore, because the presumption found in R.C. 2929.13(B)(1)(a) did not apply, the trial court acted well within its discretion by sentencing Frost to 14 months in prison rather than to a period of community control. *See State v. Hughes*, 12th Dist. Butler No. CA2013-05-081, 2014-Ohio-1320, ¶ 16 ("the clear and unambiguous language contained in R.C. 2929.13[B][1][b][iii] provided the trial court with discretion to impose a prison term for appellant's bond violation"). Accordingly, finding no merit to any of the arguments raised herein, Frost's ninth assignment of error lacks merit and is overruled.

{¶ 57} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.