[Cite as *State v. Addison*, 2020-Ohio-3500.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


STATE OF OHIO,                                :

    Appellee,                            :         CASE NOS. CA2019-07-058
                                                          CA2019-07-059
                                               :

- vs -                                       :         O P I N I O N
                                                         6/29/2020
                                               :

JOSEPH S. ADDISON,                           :

    Appellant.                           :


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case Nos. 2017CR823 and 2018CR721


D. Vincent Faris, Clermont County Prosecuting Attorney, Nick Norton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

Law Offices of William J. Rapp, Joseph R. Crousey, One East Main Street, Amelia, Ohio 45102, for appellant


**S. POWELL, J.**

{¶ 1}   Appellant, Joseph S. Addison, appeals from his convictions and sentence in the Clermont County Court of Common Pleas for rape and gross sexual imposition.  For the reasons stated below, we affirm.

{¶ 2}   Following accusations of sexual abuse by three of Addison's children, M.A., K.K., and A.A., charges were brought against Addison.  On December 21, 2017, Addison

was indicted in Case No. 2017-CR-00823, on seven counts of rape and one count of gross sexual imposition. Two of the rape counts included a specification that the victim was less than 13 years of age, while the remaining five rape counts included a specification that the victim was less than 10 years of age. The charges arose out of allegations that between February 2013 and November 2017, Addison engaged in digital penetration and cunnilingus with K.K. several times, and forced K.K. to touch his penis. K.K. was 11 years old at the time of the indictment.

{¶ 3} On August 16, 2018, Addison was indicted a second time in Case No. 2018-CR-00721, on two counts of rape, with the specification that the victim was less than 13 years of age, and three counts of gross sexual imposition. The charges arose out of allegations that in 2007, Addison touched M.A.'s vagina on two occasions and in 2015, Addison touched M.A.'s thigh near her vagina. With regard to the rape charges, the state alleged that in August 2005, Addison digitally penetrated the vagina of A.A. on two occasions. Despite the timing of the indictment, the charges relating to M.A. stemmed from allegations she made against Addison in 2016. At the time of the indictment, M.A. was 16 years old and A.A. was 21 years old.

{¶ 4} On January 10, 2019, the state moved the trial court to consolidate the two cases as the victims were biological siblings and the degree of manipulation and grooming Addison engaged in with all the victims could be characterized as a "behavioral fingerprint." The state further argued that because all of the counts in the indictments were simple and direct, each offense should be joined. Addison opposed the consolidation and further moved the trial court to sever counts four and five in case 2018-CR-00721. Addison argued the two cases involved sexual assaults allegedly committed against three separate individuals, and that the probative value of consolidating the two cases did not outweigh

- 2 -

the prejudice to Addison. Under this same reasoning, Addison argued counts four and five in case 2018-CR-00721 should be tried separately from the first three counts of the same case. After a hearing, the trial court granted the state's motion to consolidate the two cases and denied Addison's motion to sever counts four and five.

{¶ 5} On May 6, 2019, Addison's case proceeded to a jury trial. During the six-day jury trial, the state presented testimony from 22 witnesses, including the three victims. Relevant to this appeal, the following testimony was produced at trial:

### Testimony Regarding K.K.

{¶ 6} The state first presented testimony and evidence focused on K.K.'s allegations. Toni Marshall, whose relationship with K.K. began when K.K. was 13 months old, testified that she considered herself K.K.'s "mom." According to Marshall, K.K. lived off-and-on with her biological father, Addison, until 2014. At that point, K.K. began spending more time with Marshall and her family. In 2016, Addison granted temporary guardianship and legal custody of K.K. and M.A. to Marshall and her mother, Audrey Caldwell. When K.K. was in fourth grade, she moved in with Marshall and Caldwell and would occasionally visit with Addison on the weekends. Marshall indicated they would allow Addison to visit with K.K. on the weekends to appease Addison, as he would threaten to take K.K. and M.A. from them "all the time."

{¶ 7} K.K. testified that when she was around six years old Addison began touching her inappropriately. She indicated Addison put his fingers inside her vagina more than 50 times and would touch her breasts. K.K. further indicated that Addison would make her "jerk him off" sometimes, which she described as grabbing Addison's penis and "go up and down." When K.K. would "go up and down" the "wet, silky-ish, white stuff" would come out. K.K. indicated she touched Addison's penis on approximately 15 occasions. K.K. also

- 3 -

testified that before she lived with Caldwell, Addison inserted his penis into her vagina, into her mouth, and onto her leg. K.K. estimated Addison inserted his penis in her vagina approximately five times. K.K. also recalled Addison attempting to put his penis into her "back part" twice.

{¶ 8} According to K.K., the abuse occurred every weekend she visited with Addison. The abuse began when K.K. was in second grade and occurred every year until she was 11 years old. K.K. further testified that most of the abuse occurred in Addison's bed, as she slept in his bed when she visited, but indicated it also occurred on the couch and in her bedroom. K.K. indicated she was afraid to tell anyone because Addison threatened that she would not see Marshall or Caldwell if she told.

{¶ 9} Marshall also testified regarding M.A.'s similar disclosure in November 2016 and explained why she and Caldwell continued to take K.K. to Addison's after hearing M.A.'s claims. According to Marshall, at the time M.A. made her disclosure, Addison had recently taken away her phone, and Marshall viewed her claims "more as, like, she was upset trying to get [Addison] in trouble." In light of Marshall and Caldwell's reaction to M.A.'s disclosure, K.K. was "more afraid to tell," and was afraid no one would believe her.

{¶ 10} In November 2017, when K.K. was 11 years old, K.K. disclosed the abuse to Caldwell and Marshall. According to K.K., she elected to tell someone at that point because Addison indicated he was going to "put his penis in [her]" the next time she came over, which scared her. Marshall testified that during the disclosure, K.K. indicated that that inappropriate "things" had been happening for "a long time," including that Addison would make K.K. do "things" until "white stuff" came out; Addison attempted to "stick his thing" in the different "holes" she had; and that Addison would stick his fingers inside of her and touch her inappropriately. K.K. indicated the most recent incident had occurred a few days

prior.

{¶ 11} After K.K.'s disclosure, Caldwell called the police and took K.K. to Children's Hospital. When K.K. arrived at Children's Hospital, she was interviewed by a social worker. At trial, the social worker testified that the purpose of the interview was to determine whether the last instance of sexual assault occurred recent enough to require more than a basic medical exam. During the interview, K.K. stated that her dad had been touching her for the past six years. Specifically, K.K. indicated Addison had "fingered her," licked her "woo-ha," and made her "rub his 'thing,' until 'white stuff'" came out. K.K. clarified in the interview that her "woo-ha" was her vagina and that Addison's "thing" was his penis. K.K. further stated there were times where Addison attempted to insert his penis in her "butt" and vagina, but it did not go in because it "hurt too bad." K.K. also described Addison making her "finger herself." According to K.K., the last instance of sexual assault occurred on November 11, 2017. As a result of the interview, the social worker referred K.K. to the Mayerson Center.

{¶ 12} Due to the timing of the last instance of sexual assault, a doctor with Children's Hospital conducted a genital examination of K.K. At the same time, a SANE nurse completed a sexual assault kit on K.K. The doctor testified that the results of K.K.'s examination were neither normal nor abnormal. According to the doctor, K.K. did not exhibit any signs of physical injury, such as bruising, however, the doctor indicated normal findings could also be suggestive of sexual assault. Specifically, in the majority of children's sexual abuse cases there are no findings of injury. The doctor also explained that although K.K. exhibited skin tags in her perianal area, which could be a result of abuse, such a fact did not necessarily mean that abuse occurred. With regard to the genital examination, the doctor testified K.K. had a hymenal notch with a slight bit of discoloration. The doctor

concluded this also was not a definitive finding of sexual assault, however, sexual assault could not be precluded either.

{¶ 13} On November 16, 2017, K.K. met with Cecilia Freihofer, a social worker at the Mayerson Center. That day, Freihofer conducted a forensic interview of K.K. Freihofer testified at trial that K.K. indicated multiple incidents of inappropriate contact during the interview, including incidents like:

> [F]ondling of the vagina with the hand by her father; digital vaginal penetration by her father; being forced to in - - for a lack of better word, masturbate her father's penis until ejaculation. There were incidents of oral/vaginal contact where he would lick her vagina. She had to lick his penis. He put his penis in her vagina, although he also - - it was - - she was not - - in her words, like, he told her that she had to get it bigger or get it stretched out because it wouldn't go all the way in.
>
> Penile/anal contact; penile/anal penetration; oral/penile penetration where she had to lick his penis and that she had to play with his nuts, as she called them. She had to masturbate herself in front of him and that he used a tampon on her - - in her vagina one time.

K.K. then told Freihofer one or multiple of the above acts occurred every time she visited Addison. Freihofer testified that although K.K. indicated the abuse began when she was six years old, and continued for six years, it was consistent in her experience that dates and times are unknown to children.

{¶ 14} As a result of the interview, the Mayerson Center referred K.K. to seek additional therapy or treatment. After her interview, K.K. engaged in trauma-based counseling with the Mayerson Center for six or eight weeks, and remained in outside counseling at the time of trial.

{¶ 15} The state also presented testimony from Detective Erin Williams with the Union Township Police Department. The detective testified that after she was assigned the case, she reviewed the reports from the Mayerson Center and Children's Hospital

regarding the allegations. As a part of the investigation, the detective facilitated a controlled call between K.K. and Addison. A recording of the call was played for the jury and admitted into evidence. During the call, K.K. said that she has been sick lately because she had been having a hard time dealing with their "little secret" and that she wanted to talk "serious" about their secret. Addison responded that she did not have to come over to the house anymore. Addison further indicated that their secret was "done" and that K.K. "didn't have to worry about it anymore." K.K. stated she needed him to promise that he would not touch her "who-ha" anymore, to which Addison responded "okay." Addison then began discussing Christmas, and asked if K.K. wanted any "big ticket items." K.K. told him he could not buy her off, and that she wanted him to promise her "this stuff." Addison responded, "okay, it's done and over with" and "I already said fine."

{¶ 16} After the controlled call, the detective contacted the prosecutor's office and a search warrant was executed on Addison's apartment in Clermont County on November 27, 2017. While executing the search warrant, several items were collected from Addison's apartment and submitted for DNA testing including fingernail clippings, a mattress cover, a fitted sheet, a flat sheet, a section of fabric from the couch, and a DNA comparison for Addison. Those items were submitted to the Bureau of Criminal Investigations ("BCI") for DNA testing on April 27, 2018.

{¶ 17} The BCI forensic scientist who examined the items submitted by Detective Williams also testified at trial. During his testimony, the forensic scientist indicated he tested the fitted bedsheet for semen, and that the results were positive. At that point, the fitted bedsheet was stored for subsequent DNA testing and the remaining items were not tested. Thereafter, a DNA analyst with BCI testified regarding the DNA results from K.K.'s rape kit and the bedsheet. With regard to K.K.'s rape kit, the analyst testified no semen or

DNA foreign to K.K. was discovered in any of the samples included in the kit. However, the bedsheet contained two stains, each determined to contain semen. When testing the first stain, the analyst concluded that the stain contained a mixture of DNA which included the DNA of Addison, K.K., and an unknown female. K.K. was included in the mixture as one in one hundred thousand non-sperm fraction. The analyst testified his findings were consistent with K.K.'s allegation that she was forced to masturbate Addison until completion on that sheet, however, he further testified there were "numerous ways" that could explain K.K.'s DNA presence in the mixture. With regard to the second stain, the analyst concluded that while Addison's DNA and an unknown female DNA were present in the mixture, K.K. was excluded from the comparisons the analyst could make.

### Testimony Regarding M.A.

{¶ 18} At trial, M.A. testified that when she was young, her father, Addison, touched her inappropriately. M.A. specified that in 2007 Addison touched the outside of her vagina area with his hands. M.A. also described a time when she and Addison were sleeping on the floor at Addison's residence. While M.A. was sleeping, she awoke to find Addison touching her leg and "trying to go * * * between [her] legs and up [her] thighs." M.A. got up and told Addison not to touch her again.

{¶ 19} At trial, M.A. also stated that Addison asked her to "sit on [his] face" through a Facebook message, and consistently made comments about her body, including that she had "nice thighs" and a "nice butt." According to M.A., she did not tell anyone about the incidents because she did not want to be separated from K.K. Ultimately, M.A. disclosed the abuse to her friend and sister in November 2016.

{¶ 20} The state also presented testimony from Sergeant Bernard Boerger with the Clermont County Sheriff's Office. The sergeant testified that he was the road sergeant who

responded to M.A.'s allegations. The sergeant spoke with M.A.'s sister, A.A., and ultimately made contact with M.A. at Addison's residence. Due to the allegations, the sergeant removed M.A. from the residence, took her to her grandmother's home, and contacted children's protective services regarding the situation. Thereafter, the sergeant was not involved in any additional investigation into M.A.'s allegations, however, he confirmed it was not unusual for a case to remain open while additional evidence was collected. After the sergeant's initial investigation into the allegations, the case was assigned to Investigator Lori Saylor with the Clermont County Sheriff's Office. The investigator testified at trial, and stated that because Addison was aware of the allegations, the investigation was limited. According to the investigator, she advised M.A. to go to the Mayerson Center.

{¶ 21} On November 23, 2016, approximately one year prior to interviewing K.K., Cecilia Freihofer, the social worker with the Mayerson Center, interviewed M.A. regarding her allegations. At trial, Freihofer testified that at the time of the interview, M.A. was 14 years old. M.A. described the first instance of sexual assault, which occurred when she was around six years old, but she could not recall specifically what had happened. M.A. knew Addison had touched her vagina and that she did not have clothes on. M.A. recalled a second incident where Addison began rubbing her stomach on top of her clothing and attempted to put his hands down her pants. At that point, M.A. left the room.

{¶ 22} Freihofer indicated that M.A. was afraid to disclose the abuse sooner, as Addison had threatened to move her away from her family, siblings, and friends if she told. M.A. also disclosed to Freihofer that she had developed suicidal thoughts in the last week. As a result of the interview, Freihofer recommended a physical exam be completed, however, M.A. declined. Freihofer further recommended that M.A. engage in consistent ongoing therapy.

{¶ 23} At the close of the state's case-in-chief, the defense moved for an acquittal pursuant to Crim.R. 29. The trial court denied the motion. Addison did not testify on his behalf, and presented two witnesses in his defense. Both witnesses testified they had never seen Addison behave inappropriately with his daughters.

{¶ 24} Thereafter, the jury found Addison guilty of four counts of rape and three counts of gross sexual imposition. Notably, Addison was acquitted of both charges relating to A.A. After a hearing, the trial court sentenced Addison to a prison term of life without parole, which was to be served consecutively with a mandatory ten years to life prison sentence.

{¶ 25} Addison now appeals, raising five assignments of error for our review.

{¶ 26} Assignment of Error No. 1:

{¶ 27} THE TRIAL COURT ERRED BY REFUSING TO CONSIDER APPELLANT'S REQUEST TO REPRESENT HIMSELF IN THE PROCEEDINGS.

{¶ 28} In his first assignment of error, Addison argues the trial court improperly denied him the right to self-representation.

{¶ 29} According to the Sixth Amendment, a criminal has a right of self-representation and may defend himself or herself without counsel when he or she voluntarily, knowingly, and intelligently elects to do so. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 71. "The assertion of the right to self-representation must be clear and unequivocal." *Id.* at ¶ 72. A request for self-representation is not unequivocal if it is a "momentary caprice or the result of thinking out loud, or the result of frustration." *Id.* at ¶ 73. Nor is a request unequivocal if it is "an emotional response." *State v. Steele*, 155 Ohio App.3d 659, 2003-Ohio-7103, ¶ 13 (1st Dist.); see also *State v. Frost*, 12th Dist. Fayette No. CA2018-11-023, 2019-Ohio-3540.

{¶ 30} After being indicted, Addison was appointed counsel. Due to a conflict, Addison's appointed counsel withdrew from the case, and Addison was appointed new counsel, Brian Goldberg. Thereafter, Goldberg filed a motion to withdraw as counsel, as he felt the relationship had deteriorated to the point where he was unable to provide effective representation for Addison. The trial court granted Goldberg's motion, and appointed a third attorney.

{¶ 31} In September 2018, Addison's new attorney filed a motion to withdraw as counsel, wherein she indicated Addison had requested, via letter, for her to remove herself as counsel. A few days later, the trial court held a hearing regarding the matter. At the hearing, the attorney explained that Addison was dissatisfied with her representation. Addison stated he was unhappy with his attorney because he felt she was working with the prosecutor and laughed at Addison for electing to go to trial rather than accepting a plea deal. Addison also claimed his attorney would not address allegedly exonerating witnesses and would not file various motions Addison felt were necessary to his defense.

{¶ 32} Addison's mother and aunt also spoke at the hearing. Both indicated Addison's stubbornness and disabilities were difficult for an attorney to handle. However, according to Addison's aunt, Addison just wanted an attorney that would listen to him and research the case. The trial court proceeded to ask Addison whether he had a specific attorney in mind, and Addison asked to see the list of available attorneys. At that point, the following discussion ensued:

> THE COURT: [G]ive me my list.
>
> ADDISON: If I can only pick from the list, I'll pick from that list.
>
> THE COURT: Well, I'm not certain that I'm going to let you pick.
> I want to know if you had somebody in mind.
>
> ADDISON: At this point - - I'd take Goldberg back.

- 11 -

* * *

ADDISON: If he'll take me back, I'll take Goldberg.

{¶ 33} The trial court then expressed its concern to Addison, and indicated, "You're articulate. You're no dummy. You speak for yourself. But there's a limit to how far you need to go to get what you want. That's all. And sometimes you don't understand your limitations. That's why you have to have a lawyer." In response, Addison indicated that "if [he] had a lawyer that came and [saw him], [he] wouldn't have to worry about it." According to Addison, he was upset that his attorneys were not handling the case the way he wanted and that "the one thing that [he's] asked for from the very beginning * * * is [he] want[s] an attorney to come see [him]." The trial court then explained to Addison that "it's not for [Addison] to decide what [his attorneys] do" and that Addison did not understand his attorney's decisions.

{¶ 34} At that point, Addison requested to appoint himself as his own attorney. The trial court denied his request and the two continued to discuss which attorney to appoint. Addison then stated "I've asked him to appoint myself. You've already seen I'm competent enough to do it. You've denied me." The trial court responded, "[y]eah, he's just angry." The trial court and Addison then continued to discuss the attorneys who could handle the case, and ultimately reached an agreement as to several attorneys, including Goldberg, whom Addison indicated he would be comfortable proceeding with. The trial court reiterated, "Okay, you're saying that on your own?" To which Addison responded, yes.

{¶ 35} After a review of the record, we find that Addison's right to self-representation was not violated because he did not unequivocally and explicitly invoke his right. Rather, a review of the entire record reveals that Addison's reference to self-representation was the result of frustration and was an emotional response to the statements made at the hearing.

Addison's statement about representing himself came immediately after he expressed his frustrations with defense counsel's decisions and strategies, as well as his belief that his attorney was working in collusion with the prosecutor.

{¶ 36} Furthermore, Addison's statement regarding self-representation directly conflicted with his clear intention to obtain a new lawyer just minutes before at the same hearing. According to the record, before and after stating he wished to appoint himself as his own attorney, Addison and the trial court discussed in detail who was competent to represent Addison and what Addison expected from his new attorney. In fact, Addison had already requested the trial court to re-appoint Brian Goldberg, the attorney he previously terminated, at the point he indicated he wished to represent himself. Moreover, by the conclusion of the hearing, Addison had identified a number of attorneys he would be comfortable with handling his defense. Such facts are indicative that Addison's request was not clear and unequivocal. *Frost*, 2019-Ohio-3540, ¶ 30 (finding a request for self-representation was the product of an emotional response to the situation where the defendant acquiesced to his assigned counsel representing him at trial just ten minutes later). Rather, the record indicates Addison's statement was made out of frustration with the situation, as the trial court had just informed Addison that, although he could be involved in his defense, he could not decide what his attorneys did or how they conduct his defense.

{¶ 37} Lastly, aside from an additional comment near the end of the hearing, Addison did not renew his request at a later date. We are not saying that he has to do so, but we conclude that this fact is helpful in evaluating Addison's intended use of the request, i.e., was it a sincere desire to proceed pro se or manipulative in nature. Ultimately, we find the record supports the trial court's decision to deny Addison's request to proceed pro se. Accordingly, finding no merit to Addison's claims, his first assignment of error lacks merit

- 13 -

and is overruled.

{¶ 38} Assignment of Error No. 2:

{¶ 39} THE TRIAL COURT ERRED AS A MATTER OF LAW NOT GIVING A JURY UNANIMITY INSTRUCTION WHEN REQUESTED BY COUNSEL AND WHEN THE VICTIM WAS THIRTEEN YEARS OLD WHILE TESTIFYING.

{¶ 40} In his second assignment of error, Addison argues the trial court erred in denying his request to give a specific unanimity instruction to the jury. Addison asserts that in refusing to give the instruction, it created the potential for piecemeal verdicts, which is "especially true given the fact that some guilty and some not-guilty verdicts were returned for the same charges and the same victim."

{¶ 41} Jury instructions are matters left to the sound discretion of the trial court. *State v. Warman*, 12th Dist. Butler No. CA2016-02-029, 2017-Ohio-244, ¶ 35. Therefore, this court reviews the trial court's decision refusing to provide the jury with a requested jury instruction for an abuse of discretion. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Id*.

{¶ 42} This court has previously rejected similar arguments to those Addison raises on appeal. *See State v. Bowling*, 12th Dist. Butler No. CA2014-01-017, 2015-Ohio-360, ¶ 29-32; *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 22 (12th Dist.). In *Bowling*, we recognized that "a general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability." *State v. Johnson*, 46 Ohio St.3d 96, 104 (1989). "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive * * * the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Id*. While there are exceptions to this general rule as outlined in *Johnson*

- 14 -

and in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, we found in *Blankenburg* that juror unanimity is not a concern when a case involves sexual abuse perpetrated against a minor and the jury believes that a pattern of conduct of sexual abuse occurred.

{¶ 43} In the instant matter, K.K. testified that between the ages of six and eleven, Addison sexually abused her on numerous occasions. Addison argues that, in order to find him guilty, the jury was required to agree unanimously on the specific act that constituted each offense of the indictment. However, like in *Blankenburg*, we find the jury was only required to believe or disbelieve a pattern of conduct of sexual abuse occurred. Thus, the trial court was not required to provide instructions compelling the jury to agree on the specific incidents they believed established rape or gross sexual imposition for the years indicated in the indictment. *Bowling* at ¶ 32, citing *State v. Ambrosia*, 67 Ohio App.3d 552, 561 (6th Dist.1990) (finding an instruction compelling the jury to agree as to the date, time, and events in child rape case would have been erroneous, as the jury was only required to find the victim's testimony true to find defendant guilty of raping the victim over a period of years as alleged in the indictment). As such, the specific jury instruction requested by Addison was not necessary.

{¶ 44} We also find it immaterial that the jury decided to convict on some of the charges and to acquit of others. It is well established that "[e]ach count in an indictment charges a distinct offense and is independent of all other counts; a jury's decision as to one count is independent of and unaffected by the jury's finding on another count." *State v. Davis*, 12th Dist. Butler No. CA2010-06-143, 2011-Ohio-2207, ¶ 37, citing *State v. Brown*, 12 Ohio St.3d 147, 149 (1984). Consequently, we find the jury's decision to convict Addison of some of the charges, and to acquit on others, is not evidence of a piecemeal verdict.

{¶ 45} As a result, the trial court did not abuse its discretion in giving a general

unanimity jury instruction.  Addison's second assignment of error is overruled.

{¶ 46} Assignment of Error No. 3:

{¶ 47} THE COURT ERRED BY CONSOLIDATING CASES 2017 CR 00823 AND 2018 CR 00721.

{¶ 48} Next, Addison challenges the trial court's decision to consolidate cases 2017-CR-00823 and 2018-CR-00721.  Addison contends the joinder was in error because the offenses were not of the same or similar character, and even if they were, such a fact is not an appropriate basis for joinder because joinder highly prejudiced Addison.

{¶ 49} It is well settled that "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340 (1981). "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992).  Nonetheless, pursuant to Crim.R. 14, if it appears that the defendant would be prejudiced by joinder of the charged offenses, the trial court may grant a severance.  *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 95.

{¶ 50} While the defendant bears the burden of proving prejudicial joinder, the state may rebut a defendant's claim of prejudice by utilizing one of two methods.  *State v. Moshos*, 12th Dist. Clinton No. CA2009-06-008, 2010-Ohio-735, ¶ 79.  Initially, pursuant to the "other acts test," the state may rebut the defendant's claim of prejudice by demonstrating it could have introduced evidence of the joined offenses at separate trials pursuant to the "other acts" provision found in Evid.R. 404(B).  *State v. Coley*, 93 Ohio St.3d 253, 259, 2001-Ohio-1340; *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 30.  On the other hand, the state may separately negate a claim of prejudice by satisfying

- 16 -

the less stringent "joinder test," which requires the state to merely demonstrate "that evidence of each crime joined at trial is simple and direct." *Moshos* at ¶ 79, quoting *Coley* at 260. Simply stated, "[t]he joinder test only requires that the evidence of each joined offense is simple and distinct and ensures that a jury would be capable of segregating the proof required for each offense." *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, ¶ 180 (7th Dist.).

{¶ 51} On appeal, Addison focuses much of his argument on claims that the joinder fails the "other acts" test set forth above. However, "[i]f the state can meet the joinder test, it need not meet the stricter 'other acts' test." *Moshos* at ¶ 79, quoting *State v. Johnson*, 88 Ohio St.3d 95, 109, 2000-Ohio-276. That is, "[a] showing by the state that the evidence relating to each crime is simple and direct negates any claims of prejudice and renders joinder proper." *State v. Bice*, 12th Dist. Clermont No. CA2008-10-098, 2009-Ohio-4672, ¶ 53. Thus, "an accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B)." *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

{¶ 52} As an initial note, we disagree with Addison's argument that M.A.'s claims were not credible enough to charge on their own and that the state only indicted Addison for the "purpose of the prejudicial nature." Rather, the record reflects that it is not unusual to have cases open and pending while additional information comes forward. Additionally, the investigator of M.A.'s case testified that new information had come forward that would have bolstered the investigation in 2016; however, it was ultimately up to the prosecutor whether or not to bring charges against Addison sooner than 2018. Despite the delay in indicting Addison for his alleged inappropriate contact with M.A., we find the allegations were sufficient to charge on their own.

- 17 -

{¶ 53} Furthermore, after a thorough review of the record, we find no error in the trial court's decision to consolidate cases 2017-CR-00823 and 2018-CR-00721. In this case, the state presented an organized overview of the facts and charges alleged against Addison by his three daughters. The witnesses were all "victim specific" in their testimony, including testimony from each of the alleged victims detailing her own alleged sexual encounters with Addison, as well as testimony from the detectives regarding their investigation into each girl's allegations. The state also kept each victim's allegations and the supporting evidence separate in its opening and closing statements, and avoided blurring one instance of abuse into another throughout the trial. Thus, despite Addison's claims to the contrary, we find the evidence pertaining to each victim and each offense could easily be segregated. This is further evidenced by the jury's ability to sort through the evidence in order to find Addison not guilty of four counts of rape. Consequently, we find the record presents clear and direct evidence as to each separate victim such that the jury was readily able to segregate the proof on each charge. Therefore, due to the separate and distinct nature of the evidence of each crime, we find Addison was not prejudiced by the joinder of the charged offenses.

{¶ 54} Assignment of Error No. 4:

{¶ 55} THE EVIDENCE WAS INSUFFICIENT FOR A FINDING OF GUILTY.

{¶ 56} Assignment of Error No. 5:

{¶ 57} THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 58} In his remaining assignments of error, Addison argues that his convictions are against the manifest weight and are not supported by sufficient evidence.

{¶ 59} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such

evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 60} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, this court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶ 61} Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. *Stringer*, 2013-Ohio-988 at ¶ 30. Therefore, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency. *Id*. For ease of discussion, we will analyze the convictions as they relate to each child.

**K.K.**

{¶ 62} In regards to K.K., Addison was convicted of four counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides in relevant part that "[n]o person shall engage in

sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 63} As pertinent to this appeal, sexual conduct means "without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A); *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 38 (sexual conduct includes digital penetration).

{¶ 64} Addison was also convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4), which provides:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."

{¶ 65} The Revised Code defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 66} Addison argues his convictions are against the manifest weight and supported by insufficient evidence because K.K.'s allegations were so "generic" that the state could not allege specific acts that constituted the offenses alleged and because K.K. only disclosed the abuse after M.A.'s disclosure.

- 20 -

{¶ 67} As discussed above, K.K. testified that Addison sexually assaulted her every weekend she visited with Addison. K.K. indicated the abuse began when she was around six or seven years old, in second grade, and occurred every year until she was 11 years old. K.K. described the various forms of assault, and stated Addison would put his fingers in her vagina, touch her breasts, make her masturbate him, insert his penis into her mouth, vagina, and onto her leg, and attempted to insert his penis into her "back part." K.K.'s testimony describing the sexual conduct was consistent with the statements she gave to the Mayerson Center, the social worker from Children's Hospital, and in making her disclosure to Marshall and Caldwell. Moreover, while "[t]here is nothing in the law that requires that a sexual assault victim's testimony be corroborated as a condition precedent to conviction[,]" we find K.K.'s allegations were further corroborated by additional evidence presented at trial. *State v. West*, 10th Dist. Franklin No. 06AP-111, 2006-Ohio-6259, ¶ 16. Specifically, the DNA mixture found on Addison's sheet contained Addison's semen and K.K.'s DNA, which the DNA analyst testified was consistent with K.K.'s allegation that Addison forced her to masturbate him to completion. Furthermore, when confronted with K.K.'s allegations during the controlled call, Addison did not deny the allegations. Rather, Addison indicated K.K. did not have to come over anymore and that "their little secret" was done.

{¶ 68} While Addison argues K.K.'s allegations were too vague to be credible, "[a] jury is in the best position to take into account the witnesses' demeanor and thus to assess their credibility, and therefore is entitled to believe or disbelieve all, part, or none of the testimony of a witness." *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 90. K.K.'s testimony, if believed, is sufficient to prove that Addison engaged in sexual conduct with K.K. when she was under the age of thirteen at least four times. K.K.'s

testimony also sufficiently established that Addison engaged in sexual contact with K.K. by touching an erogenous zone of K.K.'s, her breasts specifically, and by forcing K.K. to touch his penis. The jury could have reasonably concluded that Addison acted as he did for the purpose of sexual gratification.

{¶ 69} We also reject Addison's argument that K.K.'s disclosure is somehow less believable because it was prompted by M.A. or Caldwell. Rather, the record reflects K.K. disclosed the abuse in response to Addison's threat to engage in vaginal intercourse the next time she visited. Additionally, due to the reaction to M.A.'s disclosure, K.K. was discouraged from disclosing her abuse sooner, as she was unsure if anyone would believe her. Thus, we find a reasonable jury could have concluded that K.K.'s disclosure was genuine.

{¶ 70} Accordingly, when viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Addison committed the crimes of gross sexual imposition and rape. We similarly conclude the jury, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial and that Addison's convictions are not against the manifest weight of the evidence.

## M.A.

{¶ 71} With regard to M.A., Addison was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(1) and (4), which state:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> (1) The offender purposely compels the other person * * * to

submit by force or threat of force.

* * *

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."

The Revised Code defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh [and] pubic region, * * * for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 72} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Additionally, a victim "need not prove physical resistance to the offender." R.C. 2907.05(D). This court has specifically recognized that the "force" requirement "need not be overt and physically brutal, but can be subtle and psychological." *State v. Rankin*, 12th Dist. Clinton No. CA2004-06-015, 2005-Ohio-6165, ¶ 47.

{¶ 73} Addison argues his convictions related to M.A. are against the manifest weight of the evidence and are not supported by sufficient evidence because M.A. only reported the abuse out of anger with Addison. Addison further claims the allegations by M.A. were insufficient to prosecute until they were inappropriately bolstered by the claims in Case No. 2017-CR-00823.

{¶ 74} At trial, M.A. testified to two specific instances of sexual assault. First, M.A. indicated that in 2007 Addison touched the outside of her vagina area with his hands. M.A. also described a time when she and Addison were sleeping on the floor at Addison's residence and she awoke to find Addison touching her leg and "trying to go * * * between [her] legs and up [her] thighs." At that point, M.A. got up, went to the bathroom, and laid down on the opposite side of Addison's residence. M.A. also described receiving

- 23 -

inappropriate messages from her father asking M.A. to "sit on [his] face" and further noted that Addison frequently made suggestive comments regarding her body. M.A. also indicated Addison would watch her take showers when she was at his residence.

{¶ 75} M.A. described Addison as angry and mean, and indicated he smashed her phone with a hammer the night she disclosed the abuse. M.A. testified that was not the only occasion Addison had smashed a device of hers and that she had witnessed him angrier on other occasions. M.A. indicated Addison exhibited an overall angry and hostile attitude, and that she feared the consequences of disclosing the abuse sooner. Specifically, the testimony at trial revealed that M.A. was fearful of retribution if she disclosed the abuse, as Addison had indicated he would move her away from her family, siblings, and friends if she told anyone what happened. This led to M.A.'s fear that if she told, she would "get taken away" and that she would be separated from K.K. According to M.A., she "kn[e]w how he [wa]s and [she] didn't want [K.K.] to get hurt."

{¶ 76} After reviewing the entire record, we do not find that the jury clearly lost its way and created a miscarriage of justice. The testimony of M.A., if believed, weighed in favor of Addison's guilt. Although brief, M.A.'s testimony was sufficient to show that illegal sexual contact occurred. R.C. 2907.01(B) (defining "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh [and] pubic region" for the purpose of sexual gratification). While Addison denies the offenses took place, and claims that M.A. had ulterior motives for disclosing the alleged abuse, the jury was in the best position to assess M.A.'s credibility, and therefore was entitled to believe M.A. With regard to the force element in R.C. 2907.05(A)(1), we find there is evidence in the record indicating that Addison compelled M.A. to submit to the sexual contact by force or threat of force. The record reflects that Addison, as M.A.'s father, held a position of authority over

M.A. at the time of the abuse.  This fact, coupled with Addison's threats to "take M.A. away" if she told, and M.A.'s desire to protect K.K. from experiencing similar injury, establishes that Addison used subtle and psychological degrees of force to facilitate the inappropriate contact.  Furthermore, Addison initiated the contact with M.A. while she was sleeping.  When she awoke, Addison was physically attempting to get between her legs and proceed up her up her thighs.  As a result, we find a reasonable jury could conclude Addison compelled M.A. to submit to the sexual contact by force or threat of force.

{¶ 77} Based on the above, we find that Addison's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence.  The state presented evidence which, if believed by the jury, would allow it to conclude that all of the elements of each gross sexual imposition conviction were proven beyond a reasonable doubt.

{¶ 78}  Accordingly, Addison's remaining assignments of error are overruled.

{¶ 79}  Judgment affirmed

HENDRICKSON, P.J., and RINGLAND, J., concur.