[Cite as *State v. Holloway*, 2024-Ohio-3360.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-12-114 |
| | : | O P I N I O N |
| - vs - | | 9/3/2024 |
| | : | |
| TIMOTHY HOLLOWAY, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 23CR40430


David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Arenstein & Gallagher, and Elizabeth Conkin, for appellant.



**S. POWELL, P.J.**

{¶ 1} Appellant, Timothy Holloway, appeals his conviction in the Warren County Court of Common Pleas after a jury found him guilty of two counts of first-degree felony rape in violation of R.C. 2907.02(A)(2). For the reasons outlined below, we affirm Holloway's conviction.

**Introduction**

{¶ 2}   The relevant individuals involved in this case, Holloway, and his three alleged victims, C.R., M.W., and C.L., were all at one time members of Hash House Harriers ("HHH") in Cincinnati, Hamilton County, Ohio.   The HHH is a social/running/drinking club that was established in 1938 by British soldiers stationed in Malaysia during the build-up to World War II.   Today, HHH has chapters, affectionately referred to by HHH members as "kennels," in most major cities throughout the country and around the world.   This includes the HHH kennel located in Cincinnati.   The Cincinnati kennel is known as the "Sin City" kennel.   On its website, the Sin City kennel refers to itself as "a drinking club with a running problem."

{¶ 3}   HHH members participate in events to raise money for charity and other so-called "hash" events.   A "hash" is a type of race/meet-up that generally involves one to three "beer stops" along a three-to-six-mile wooded trail where two HHH members, the "hares," set out markers that the other HHH members, the "hounds," are to follow—like a scavenger hunt for beer, a social event, that provides some exercise along the way.   There may also be other "checks" along the trail, like a "boob check" or a "package check," where the male and female participants in the hash have the option of showing either their breasts or their penis before moving on to the next stop.   This is in addition to a "shot check" where participants are provided with a shot of alcohol to drink prior to moving on.

{¶ 4}   The use of nicknames is how HHH members generally communicate amongst themselves.   This is to provide HHH members with a certain level of anonymity. Unlike the nicknames provided to HHH members in other countries, the nicknames provided to HHH members in the United States are oftentimes rife with sexual undertones and inuendo.   For example, within HHH's Sin City kennel in Cincinnati, Holloway was given the nickname "No Funyun," whereas C.R., M.W., and C.L. received the nicknames,

"G-Spot," "Fourgasm" or "Four-G's," and "Dicklopedia," respectively. Holloway's then long-term, live-in girlfriend, Maggie, was also an HHH member who participated in the Sin City kennel's hashes. The Sin City kennel gave Maggie the nickname "Whooters" or "Dr. Whooters."[1]

**Facts and Procedural History**

{¶ 5} On April 3, 2023, the Warren County Grand Jury returned an indictment charging Holloway with two counts of rape in violation of R.C. 2907.02(A)(2), both first-degree felonies pursuant to R.C. 2907.02(B). These two charges were set forth in Counts 1 and 2 of the indictment. The indictment also charged Holloway with one count of gross sexual imposition in violation of R.C. 2907.05(A)(1), a fourth-degree felony under R.C. 2907.05(C)(1). This charge was set forth in Count 3 of the indictment. The indictment alleged the following facts as it relates to each of those three offenses.

{¶ 6} Count 1 arose after it was alleged Holloway had raped his first alleged victim, C.R., by forcibly holding her down and engaging in vaginal intercourse with her. This rape was alleged to have occurred on the living room couch found in Holloway's home located in Mason, Warren County, Ohio sometime between April 1, 2021 through May 1, 2021.

{¶ 7} Count 2 arose after it was alleged Holloway had raped his second alleged victim, M.W., by forcibly thrusting his hand into her pants and digitally penetrating her vagina with his fingers. This rape was alleged to have occurred while Holloway was driving M.W. to her Hamilton County, Ohio home from a brewery located in Hamilton, Butler County, Ohio on the evening of February 6, 2022.

{¶ 8} Count 3 arose after it was alleged Holloway grabbed the breasts and

---

1. The record indicates that Holloway and his now ex-girlfriend, Maggie, mutually agreed to break off their nine-year relationship just prior to the allegations against Holloway becoming known.

buttocks of his third alleged victim, C.L., while the two were laying on a bed located in a spare bedroom in Holloway's home sometime between November 1, 2019 and January 31, 2020.

**The Jury Trial**

{¶ 9} On April 5, 2023, Holloway was arraigned and entered a plea of not guilty to all three charges. Several months later, on November 6 through November 8, 2023, the trial court held a jury trial on the matter. During the trial, the jury heard testimony from a total of six witnesses. This included testimony from all three of Holloway's alleged victims, C.R., M.W., and C.L. The following is a summary of those three witnesses' testimonies.

*Summary of C.R.'s Testimony – Count 1*

{¶ 10} C.R., aka G-Spot, became a member of HHH in 2013. On April 30, 2021, C.R. met up with some friends to have a drink at a brewery in Mason, Warren County, Ohio. Holloway, minus his then girlfriend, Maggie, was one of those friends.[2] C.R. testified that she arrived at the brewery at approximately 7:00 p.m. Once there, C.R. testified that she consumed somewhere between two to four beers over the next two to three hours. C.R. testified that after finishing up at the brewery, Holloway then drove her and two other friends back to his house to hang out. C.R. testified that this consisted primarily of them "all standing around and drinking beer and whatever was there and talking" in Holloway's kitchen. However, rather than just beer, C.R. testified that Holloway also gave her Absinthe to drink.[3] C.R. testified that this ultimately resulted in her consuming approximately five to six ounces of Absinthe, plus an additional one or two

---

2. The record indicates that Maggie was at that time in the hospital after undergoing gallbladder surgery.

3. The United States Supreme Court has defined Absinthe as "the common name of a highly aromatic liqueur of an opaline green color and bitter taste" that is prepared by "steeping in alcohol or strong spirit bitter herbs," the chief of them being wormwood. *Erhardt v. Steinhardt*, 153 U.S. 177, 182 (1894).

cans of beer, within a span of an hour-and-a-half.

{¶ 11} C.R. testified that as the group of friends began to leave Holloway's house that she, clearly feeling the effects of the Absinthe, went and sat down on the living room couch. C.R. testified that it was at this point that Holloway also came into the living room and took a seat on the couch across from her. C.R. testified that she and Holloway then started talking and listening to music. C.R. testified that she and Holloway did this for some time until approximately 1:00 a.m. As the night wore on, C.R. testified that she then told Holloway that she was tired and that she wanted to go to sleep. C.R. testified that Holloway then got up from his seat on the couch, came over to her, took off her glasses, and kissed her. To this, C.R. testified that she was "stunned," "shocked," and that she just "froze." Although frozen to the spot, C.R. testified that she nevertheless kissed Holloway back because she "wasn't able to find the strength to do anything other than do that in the moment."

{¶ 12} C.R. testified that as they were kissing, Holloway proceeded to get "closer" to her and eventually "got on top" of her. C.R. testified that Holloway then began to pull down her pajama bottoms and "boy shorts" that she had been wearing that night. To this, C.R. testified that she "could figure out what might happen" so she told Holloway in a loud and clear voice, "no, Tim stop, don't, no, stop. Don't." C.R. testified that she also tried to push Holloway off of her while saying, "no Tim stop. Maggie, I respect Maggie, Tim no, don't do this." C.R. testified that Holloway responded by stating, "no, don't worry about it, it's fine. Don't worry about it."

{¶ 13} Although clearly telling Holloway no and to stop, C.R. testified that Holloway was nonetheless able to successfully pull down her pajama bottoms and boy shorts and insert his penis into her vagina. After penetrating her vagina with his penis, C.R. testified that Holloway then proceeded to have vaginal intercourse with her for "maybe two

- 5 -

minutes." C.R. testified that after Holloway had sex with her for those two minutes that Holloway then stopped and got up. Once Holloway stopped, C.R. testified that she put her clothes back on. C.R. testified that she and Holloway then went upstairs and went to sleep in Holloway's bedroom. When asked how that happened, how she could go and sleep in the same bed as a man who she claims had just raped her, C.R. testified:

> I think there was some words exchanged and I was still in shock and kind of felt like—I kind of pretend, when I'm in fear, that I'm not having that experience directly myself, but I'm almost just watching from down below. And, that it's not really me. So I kind of was in a state of mind to rationalize decisions because of what had just happened.

C.R. also testified when asked why she did not just leave rather than going upstairs to sleep in Holloway's bed, "I could not rationally think. I was shocked by what he'd done. I was tired, I had been drinking and it just wasn't a choice I could make at that time."

{¶ 14} C.R. testified that she woke up early the next morning and stayed awake until the sun began to rise over the horizon. C.R. testified that, after being awake for several hours, Holloway then also woke up and they "ended up having sex again." When asked why she did not tell Holloway no and to stop and push Holloway off like she had done the night done before, C.R. testified:

> I was just in shock over what had happened the night before and I knew I wasn't thinking rationally and I think a part of me just, in the moment, it was my way of self-protecting, that's all I knew to do.

C.R. also testified that she "did not want that to happen and it wouldn't have happened, had the downstairs not happened," something that C.R. later testified was "entirely against [her] will."

{¶ 15} C.R. testified that after having sex that morning that she and Holloway then both got up out of bed and dressed. Once dressed, C.R. testified that Holloway then drove her back to the brewery in Mason where she had parked her car the night before.

C.R. testified that she later confronted Holloway about what had happened at a subsequent hash event, stating "that thing that happened, that should've never happened," to which Holloway responded, "fair enough." C.R. testified that she eventually told her new boyfriend what had happened to her, which ultimately resulted in C.R. reporting to police that Holloway had raped her. The record indicates that C.R. made this report in the summer of 2023 approximately two years after the alleged rape was said to have occurred.

*Summary of M.W.'s Testimony – Count 2*

{¶ 16} M.W., aka Fourgasm or Four-G's, became a member of HHH in September of 1999. M.W. testified that she lives next to Sharon Woods on "the Hamilton County side" of Fields Ertel Road approximately three-to-four miles from Holloway's house in Mason, Warren County, Ohio. Following a hash event that took place in Hamilton, Butler County, Ohio on the afternoon of February 6, 2022, M.W. testified that Holloway had offered to drive her home so that her husband, who was cold and not feeling well, could go home and rest up. Given the closeness between their two homes, M.W. testified that she agreed and accepted Holloway's offer of a ride home. After securing her ride home, M.W. testified that she and Holloway then went to a nearby brewery in Hamilton to get a drink. While at the brewery, M.W. testified that both she and Holloway each drank two beers, which M.W. testified that she paid for, "to be nice, to say hey, thanks for the ride home."

{¶ 17} M.W. testified that once they finished drinking their beers, she and Holloway then left the brewery and got into Holloway's car so that he could drive her home. M.R. testified that shortly after Holloway began driving her home that Holloway, while speeding and breaking multiple other traffic laws, and with just his left hand on the steering wheel, got his right hand into her pants "likety split," "[i]nside of [her] underwear, all the way down

- 7 -

to skin," and "was taking his fingers and they were inside of [her] female parts," her "vaginal area." M.W. testified that Holloway "went straight there," "[r]ight to the point," and "just went to town." M.W. also testified that she could "[a]bsolutely" feel Holloway's fingers inside her vagina and that it "hurt because he bites his nails, so it was very scratchy."

{¶ 18} M.W. testified that while Holloway was digitally penetrating her vagina that she "kept asking him to stop, stop, stop…" the whole time. M.W. testified that she also tried to pull Holloway's hand out from her pants, and his fingers out of her vagina, but that "[h]e was strong. No, not able to, he's strong." When asked if Holloway ever said anything during this time, M.W. testified:

> Yeah, he was like, oh, doesn't this turn you on and you know,
> oh just a whole bunch of lewd things. And I'm telling him stop,
> stop, stop. I don't lift weights or anything. My arms, as you
> get older—I'm not strong.

M.W. also testified when asked if Holloway ever stopped at any of the stop signs, and if he had stopped, whether she would have tried to get out of the car, "Oh, heck yeah. I would've taken off my seatbelt. I left it on because of high speeds but there was nowhere for me to go." M.W. testified that Holloway eventually stopped penetrating her vagina with his fingers once he pulled into her Hamilton County home's driveway. M.W. testified that Holloway then "took his hand out, was sniffing his fingers and making comments like I hope that was really good for you and you know, sniffing, licking. That was a turn on, I guess."

{¶ 19} M.W. testified that she then got out of Holloway's car and went straight inside her house to where her husband was waiting and watching something on his computer. M.W. testified that she did not immediately tell her husband what had happened, however, because:

when I accepted a ride home, I didn't anticipate what was going to happen or else I wouldn't have accepted a ride home and I think I was still in shock. And, so, I just immediately went into the bathroom, closed the door and trying to attend to myself, clean myself up.

M.W. testified that this included her cleaning up some blood from her vagina and applying Vaseline to her vagina in order to "calm it down," the pain that she felt in her vagina for a "good number of days, probably just short of a week."

{¶ 20} The record indicates that M.W. sent a message to Holloway later that evening via Facebook Messenger sarcastically stating that she appreciated Holloway driving her home earlier that day. This message included an "eyes rolling" emoji. Holloway responded to M.W.'s message 40 seconds later by stating, "Should have made out with me in the car, want to do lunch tomorrow?" Three days later, M.W. responded, "NO NO FUNyan. Rather just enjoy hashin w/ you & Whooters." M.W. thereafter testified that, although she was still in shock and embarrassed about what had happened to her, and even though she is part of the "baby boomer" generation who just pull themselves up by the bootstraps and move on, she eventually did speak with the police about what she alleged Holloway had done to her. The record indicates that M.W. spoke with police over a year after the alleged rape was said to have occurred.

*Summary of C.L.'s Testimony—Count 3*

{¶ 21} C.L., aka Dicklopedia, became a member of HHH in June of 2019. Following a hash event that took place on the afternoon of January 4, 2020, C.L., along with several other HHH members who had participated in that day's hash event, went to Twin Peaks, a nearby bar/restaurant in Mason [sic], to have some more drinks and grab a bite to eat. C.L., who testified that she had consumed less than two beers and possibly a shot of vodka during that day's hash, described Twin Peaks as kind of like a Hooter's, "but apparently with better food." C.L. testified that after finishing up at Twin Peaks that

she and three others, two of which were Holloway and Holloway's then girlfriend, Maggie, went to a brewery and then to a "dive bar" before finally heading back to Holloway's house to spend the night. C.L. testified that she did this because Holloway "had offered" and because she was "very cautious about drinking and driving" and did not want to make the approximately 40-minute drive to her home in Kentucky after having consumed that much alcohol.

{¶ 22} C.L. testified that upon arriving at Holloway's house, she continued drinking both hard seltzer and beer before eventually heading to bed in one of the Holloway's home's two spare bedrooms. C.L. testified that this occurred at approximately 2:30 or 3:00 a.m. C.L. testified that later that night she awoke to find Holloway laying "behind" her on the bed, "touching" her, "reaching over" her side, underneath her shirt, and "up over" her breasts. C.L. testified that during this time she could feel Holloway's erect penis pressing against her back near her buttocks. C.L. testified that in response to Holloway touching her breasts that she "tucked" her arm and then proceeded to "push" Holloway's arm away. C.L. testified that she did this all while making a groaning sound to indicate that she did not want to be touched, a "deterring" sound, "not an oh yeah," type of noise. To this, C.L. testified that, rather than stopping, Holloway instead moved his hand down to her hip and around her stomach.

{¶ 23} C.L. testified that it was at this time that another of the HHH's Sin City kennel members sleeping over at Holloway's house came into the room and said, "what's going on in here?" C.L. testified that this member then said to Holloway something to the effect of, "it's time for bed" or "let's get to bed." C.L. testified that Holloway then got up off the bed and left the room. This other member testified and confirmed C.L.'s testimony about what he had said to Holloway upon finding Holloway in bed with C.L. early that morning. C.L. testified that after Holloway left the room that she just "laid there" in "shock," "freaked

out," and "still computing what just happened." C.L. testified that she then "dozed" off until morning when she left Holloway's home in Mason and drove back to her own home in Kentucky. C.L. testified that she did not immediately tell anybody about this incident because:

> I was still very new in the hash and [Holloway] was a fixture in the hash and from what I could tell respected and I didn't want to be that girl that just started and I loved it, I loved the hash. I didn't want to hurt Maggie [Holloway's girlfriend], I didn't want to hurt the hash, so—and I thought it was just me and a one time incident and I just, you know, brushed it under the rug and let it go and get over it.

**The Jury's Verdict, The Trial Court's Sentence, and Holloway's Appeal**

{¶ 24} Following deliberations, which the record indicates lasted a total of just 93 minutes, the jury returned a verdict finding Holloway guilty of raping C.R. and M.W. as alleged in Counts 1 and 2 of the indictment, but not guilty of gross sexual imposition against C.L., as alleged in Count 3 of the indictment. Upon receiving the jury's verdict, the trial court scheduled the matter for sentencing and ordered that a presentence investigative report be completed. The trial court held the previously scheduled sentencing hearing on December 19, 2023. During this hearing, the trial court sentenced Holloway to serve an indefinite sentence of four to six years in prison, less 47 days of jail-time credit. The trial court also ordered Holloway to pay court costs and notified Holloway that he would be subject to a mandatory five-year period of postrelease control following his release from prison. This is in addition to the trial court classifying Holloway as a Tier III sex offender.

{¶ 25} On December 20, 2023, Holloway filed a notice of appeal from his conviction. Following briefing, oral argument was held before this court on August 5, 2024. Holloway's appeal now properly before this court for decision, Holloway has raised six assignments of error for review. For ease of discussion, we review Holloway's first

- 11 -

four assignments of error together and Holloway's fifth and sixth assignments of error out of order.  Those first four assignments of error are as follows.

**Assignment of Error No. 1:**

{¶ 26} DEFENSE COUNSEL WERE INEFFECTIVE IN FAILING TO FILE A MOTION TO SEVER THE CHARGES AGAINST HIM, THEREBY DENYING MR. HOLLOWAY OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL AND FIFTH AMENDMENT RIGHT TO A FAIR TRIAL.

**Assignment of Error No. 2:**

{¶ 27} DEFENSE COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE JURY INSTRUCTION REGARDING VENUE OF COUNT TWO, THEREBY DENYING MR. HOLLOWAY OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL AND FIFTH AMENDMENT RIGHT TO A FAIR TRIAL.

**Assignment of Error No. 3:**

{¶ 28} DEFENSE COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO EVIDENCE MR. HOLLOWAY HAD BEEN BANNED FROM THE CINCINNATI HHH AND TO THE STATE'S USE OF THE TERM "VICTIM" WHEN DESCRIBING AND OR REFERRING TO THE COMPLAINING WITNESSES, THEREBY DENYING MR. HOLLOWAY OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL AND FIFTH AMENDMENT RIGHT TO A FAIR TRIAL.

**Assignment of Error No. 4:**

{¶ 29} THE CUMULATIVE EFFECT OF DEFENSE COUNSEL'S ERRORS VIOLATED MR. HOLLOWAY'S EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND THE CONSTITUTION OF THE STATE OF OHIO, AND DENIED HIM HIS FIFTH AMENDMENT RIGHT TO A FAIR TRIAL.

{¶ 30} In his first, second, third, and fourth assignments of error, Holloway argues his trial counsel provided him with ineffective assistance both before and during the jury trial held in this matter. We disagree.

*Ineffective Assistance of Counsel Standard*

{¶ 31} "A criminal defendant has the right, under both the United States and Ohio Constitutions, to the effective assistance of counsel." *State v. Pennington*, 2024-Ohio-2020, ¶ 34 (12th Dist.). However, while a criminal defendant is constitutionally guaranteed the effective assistance of counsel, the criminal defendant's counsel is also afforded a strong presumption "to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Burns*, 2014-Ohio-4625, ¶ 7 (12th Dist.). Given this presumption, to prevail on an ineffective assistance of counsel claim, a criminal defendant challenging the effectiveness of his or her counsel on appeal must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *State v. Ford*, 2021-Ohio-782, ¶ 13 (12th Dist.).

{¶ 32} "[U]nder *Strickland*, in order to prevail on a claim that counsel was ineffective, a criminal defendant must show (1) that his counsel's performance was deficient and (2) that that performance prejudiced him." *State v. Simpson*, 2020-Ohio-6719, ¶ 18, citing *Strickland* at 687. This test requires the reviewing court to "determine whether the totality of circumstances supports a finding that counsel's performance was deficient, and if so, whether the deficient performance was prejudicial to the defendant." *State v. Romero*, 2019-Ohio-1839, ¶ 34. "Trial counsel's performance is considered deficient where 'that counsel's performance fell below an objective standard of reasonable representation . . . .'" *State v. Zamora*, 2023-Ohio-1847, ¶ 21 (12th Dist.), quoting *State v. Drain*, 2022-Ohio-3697, ¶ 67. Therefore, to establish deficient performance, the appellant must show "that counsel made errors so serious that counsel failed to function

- 13 -

as the 'counsel' guaranteed by the Sixth Amendment." *State v. Hamblin*, 37 Ohio St.3d 153, 156 (1988), citing *Strickland* at 687.

{¶ 33} "Trial counsel's deficient performance is deemed prejudicial where there exists 'a reasonable probability that, but for counsel's errors, the proceeding's result would have been different.'" *State v. Elcess*, 2023-Ohio-2820, ¶ 22 (12th Dist.), quoting *State v. Lawson*, 2021-Ohio-3566, ¶ 93. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Brown*, 2024-Ohio-749, ¶ 64, quoting *Strickland* at 694. Accordingly, to establish prejudice, the appellant must show "'that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.'" *State v. Cepec*, 2016-Ohio-8076, ¶ 51, quoting *Strickland* at 687.

{¶ 34} A reviewing court may approach the two-pronged ineffective assistance of counsel analysis set forth in *Strickland* by "starting with either prong, and it need not examine the effectiveness of counsel's performance if appellant fails to prove prejudicial effect." *State v. Reeder*, 2014-Ohio-2233, ¶ 32 (12th Dist.), citing *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). This is because, as is now well established, "[t]he failure to make an adequate showing on either prong is fatal to an ineffective assistance of counsel claim." *State v. Jewell*, 2022-Ohio-2727, ¶ 19 (12th Dist.). Therefore, as noted by the Ohio Supreme Court, "'[a] defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other.'" *State v. Shouse*, 2014-Ohio-4620, ¶ 29 (12th Dist.), quoting *State v. Madrigal*, 87 Ohio St.3d 378, 389, 2000-Ohio-448.

*Failure to File a Motion to Sever*

{¶ 35} In his first assignment of error, Holloway argues his trial counsel was ineffective for failing to file a motion to sever the charges levied against him. We disagree.

{¶ 36} "Pursuant to Crim.R. 8(A), two or more offenses may be charged in the same indictment if the offenses charged are: (1) of the same or similar character; (2)

- 14 -

based on the same act or transaction; (3) based on two or more acts or transactions connected together or constituting parts of a common scheme or plan; or (4) part of a course of criminal conduct." *State v. Hall*, 2022-Ohio-1147, ¶ 216 (12th Dist.). The law favors joining multiple offenses in a single trial. *State v. Moshos*, 2010-Ohio-735, ¶ 78 (12th Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). "The joinder of offenses is, in fact, to be liberally permitted in circumstances where the requirements set forth in Crim.R. 8(A) are satisfied." *Hall*, citing *State v. Wilson*, 2002-Ohio-4709, ¶ 49 (12th Dist.). This is because, as is now well established, the joinder of offenses "'conserve[s] judicial resources, reduce[s] the chance of incongruous results in successive trials, and diminish[es] inconvenience to the witnesses.'" *State v. Addison*, 2020-Ohio-3500, ¶ 49 (12th Dist.), quoting *State v. Schaim*, 65 Ohio St.3d 51, 58, 1992-Ohio-31. "Nonetheless, pursuant to Crim.R. 14, if it appears that the defendant would be prejudiced by joinder of the charged offenses, the trial court may grant a severance." *State v. Morsie*, 2014-Ohio-172, ¶ 28 (12th Dist.), citing *State v. Diar*, 2008-Ohio-6266, ¶ 95. "The defendant bears the burden of proving prejudicial joinder." *State v. Freeze*, 2012-Ohio-5840, ¶ 31 (12th Dist.).

{¶ 37} While the defendant bears the burden of proving prejudicial joinder, the state may rebut the defendant's claim by utilizing one of two methods. *State v. Ashcraft*, 2009-Ohio-5281, ¶ 16 (12th Dist.). These two methods are known as the "other acts test" and the "joinder test." *See State v. Workman*, 2017-Ohio-8638, ¶ 76 (12th Dist.). The "other acts test" requires the state to demonstrate that it could have introduced evidence of the joined offenses at separate trials pursuant to the "other-acts" provision set forth in Evid.R. 404(B). *State v. Hensley*, 2010-Ohio-3822, ¶ 40 (12th Dist.). On the other hand, the "joinder test" requires the state to demonstrate that evidence of each crime joined at trial is "simple and direct." *State v. Matthews*, 2013-Ohio-3482, ¶ 38 (12th Dist.). "'If the

- 15 -

state can meet the joinder test, it need not meet the stricter 'other acts' test.'" *Moshos*, 2010-Ohio-735 at ¶ 79, quoting *State v. Johnson*, 88 Ohio St.3d 95, 109, 2000-Ohio-276. That is to say, "[a] showing by the state that the evidence relating to each crime is simple and direct negates any claims of prejudice and renders joinder proper." *State v. Bice*, 2009-Ohio-4672, ¶ 53 (12th Dist.). "'[A]n accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B).'" *Hall*, 2022-Ohio-1147 at ¶ 217, quoting *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

{¶ 38} After a thorough review of the record, we find the evidence relating to each of the three charges levied against Holloway was simple and direct, thereby satisfying the joinder test set forth above. The charges involved three different women (C.R., M.W., and C.L.), that took place in three separate and distinct locations (Holloway's living room couch, Holloway's car, and in one of Holloway's two spare bedrooms), and at three separate times over a period of three different years (2020, 2021, and 2022). The testimony elicited by the state was also presented to the jury with victim specific witnesses who testified to matters that were specific to each of those three women and their alleged unwanted sexual encounters with Holloway. This tactic ensured that the evidence elicited by the state as to each of the three charges remained separate and distinct from one another. This tactic also made it very unlikely that the jury would be confused by which of the three charges went with which of Holloway's three alleged victims, C.R., M.W., and C.L. This is particularly true in this case when considering the trial court instructed the jury as part of its final jury instructions that:

> The charges set forth in each count constitute a separate and distinct matter. You must consider each count and the evidence applicable to that count separately and you must state your findings with each count uninfluenced by your verdict as to any other count. The defendant may be found

- 16 -

guilty or not guilty of one or all of the offenses charged.

{¶ 39} It is presumed that the jury followed the trial court's instructions. *State v. Thompson*, 2023-Ohio-559, ¶ 26 (12th Dist.). Therefore, because the evidence elicited by the state at trial was simple and direct, any motion to sever filed by Holloway's trial counsel in this case would have been futile. "An attorney is not ineffective for failing to make a futile or frivolous request." *State v. White*, 2022-Ohio-2182, ¶ 14 (12th Dist.). "Trial counsel is [also] not ineffective for failing to make a futile argument." *State v. Trafton*, 2023-Ohio-122, ¶ 29 (12th Dist.); *see, e.g., Hensley*, 2010-Ohio-3822 at ¶ 37-43 (appellant's trial counsel was not ineffective for failing to file a motion to sever where "a motion to sever would not have been meritorious" because "the evidence of each crime was simple and direct" given that "the state made it clear that each victim's alleged encounters with appellant were separate, distinct incidents"). Accordingly, Holloway's first argument alleging his trial counsel was ineffective for failing to file a motion to sever the charges levied against him lacks merit.

*(2) Failure to Object to the "Course of Criminal Conduct" Jury Instruction*

{¶ 40} In his second assignment of error, Holloway argues his trial counsel was ineffective for failing to object to the trial court's "course of criminal conduct" instruction provided to the jury as it relates to Count 2 of the indictment. Specifically, Holloway argues the trial court erred by instructing the jury, pursuant to R.C. 2901.12(H), that in order to establish Warren County as a proper venue for his alleged rape of M.W., the state was required to "prove beyond a reasonable doubt that all or any part of the offenses involved in the defendant's course of conduct occurred in Warren County," and that:

> In order for you to find the defendant's course of conduct occurred in Warren County, then you must find beyond a reasonable doubt any of the following:
>
> One, the offenses involved alleged victims of the same type

or from the same group;

Two, the offenses were committed in the same relationship to the alleged victims;

The offenses were committed as part of the same chain of events, and furtherance of the same purpose or objective;

Four, the offenses involved the same or similar plan or method; and

Finally, the offenses were committed along the defendant's line of travel in this State, regardless of his origin or destination.

{¶ 41} Holloway claims his trial counsel's failure to object to this instruction amounted to deficient performance that was prejudicial to him because there was an "absence of any evidence" to support a "course of criminal conduct" instruction ever being given to the jury. However, contrary to Holloway's claim, the record contains ample evidence to support the trial court providing the jury with the "course of criminal conduct" instruction as set forth above. This includes evidence that all three women, C.R., M.W., and C.L., were of the same type and part of the same group, the HHH, and more specifically, the Sin City kennel. This also includes evidence that all three offenses were alleged to have been committed by Holloway in his same relationship to those three women, and in furtherance of the same purpose or objective, his own sexual gratification.

{¶ 42} This is in addition to the evidence indicating that all three offenses involved Holloway deploying the same or similar plan or method when committing those offenses. This includes evidence that Holloway made his move only after each of the three women were alone with him, either at his home or in his car, after having consumed multiple alcoholic beverages. Therefore, because the trial court did not err by providing the jury with the above "course of criminal conduct" instruction in order to establish Warren County as the property venue for Count 2 of the indictment, Holloway's trial counsel was also not

ineffective for failing to object to the trial court giving that instruction to the jury. This is because, had Holloway's trial counsel done so, any such objection surely would have been overruled by the trial court. Again, trial counsel is not ineffective "for failing to make a futile argument." *Trafton*, 2023-Ohio-122 at ¶ 29. Accordingly, Holloway's second argument also lacks merit.

### (3) Failure to Object to Evidence that Holloway Had Been Banned from HHH's Sin City Kennel and References to C.R., M.W., and C.L. as "Victims" at Trial

{¶ 43} In his third assignment of error, Holloway argues his trial counsel provided him with ineffective assistance by failing to object to the state eliciting testimony that he had been banned from the Sin City kennel following C.R.'s, M.W.'s, and C.L.'s allegations against him becoming known. Within that same assignment of error, Holloway also argues his trial counsel was ineffective for not objecting to C.R., M.W., and C.L. being referred to as "victims," as opposed to his "alleged victims," at trial. This is because, according to Holloway, this evidence improperly "bolstered the credibility of the women" claiming he had "sexually assaulted them." However, even if we were to assume Holloway's trial counsel was somehow deficient for failing to object to this evidence, which, as discussed more fully below, we do not, whatever prejudice resulted from the introduction of such evidence at trial, if any, did not in any way impact the jury's verdict finding Holloway guilty of raping C.R. and M.W. as alleged in Counts 1 and 2 of the indictment.

{¶ 44} In so holding, we note that the evidence regarding Holloway's ban from the Sin City kennel initially came out during the state's redirect examination of C.R. only after Holloway's trial counsel cross-examined C.R. about she having herself received a one-year ban from a different kennel. This testimony included, in its entirety, the following exchange between C.R. and the state:

Q. All right. And, you were asked whether or not you had been banned from another kennel. How long were you banned from another kennel?

A. For one year.

Q. Was the defendant banned from this kennel?

A. Not at that time.

Q. Has he been banned?

A. He has.

{¶ 45} That Holloway had been banned from the Sin City kennel after the allegations against him became known was also briefly mentioned by M.W. during her direct examination when asked by the state about the time she finally felt comfortable telling her husband about Holloway raping her. This exchange included, in its entirety, the following:

Q. And, then later that same year, is that when he was banned from the hash?

A. Yes.

Q. And when do you finally – or let me ask you, do you ever tell your husband?

A. After I found out that he was banned from the hash.

Q. Okay. And, why did you wait until then?

A. Well, because it's not pleasant you know, and how in the heck did I get myself in that situation and if I would've told him earlier, he would've been angry and would've wanted to confront [him] and I didn't want that to happen.

{¶ 46} This is in addition to Holloway's ex-girlfriend, Maggie, briefly mentioning that the timing of her and Holloway's breakup occurred "right before" the allegations levied against Holloway became known, thus resulting in Holloway's ban from the Sin City kennel. These fleeting references to Holloway's ban were just that, fleeting, and hardly

something that would have had any meaningful impact on the proceedings so as to undermine this court's confidence in the jury's verdicts finding him guilty of raping C.R. and M.W. as alleged in Counts 1 and 2 of the indictment.

{¶ 47} Moreover, that Holloway's trial counsel did not object to any of these brief mentions of Holloway being banned from the HHH's Sin City kennel, or to C.R., M.W., and C.L. being referred to as his "victims" at trial, can be seen as a strategic decision on the part of counsel to avoid calling any greater attention to those matters than deserved. "[T]he decision to object or not object is within the strategic consideration of trial counsel." *State v. Villani*, 2019-Ohio-1831, ¶ 19 (12th Dist.). That is to say, the "[f]ailure to make objections does not automatically constitute ineffective assistance of counsel . . . ." *State v. Homer*, 2006-Ohio-1432, ¶ 15 (12th Dist.). "This is because '[o]bjections tend to disrupt the flow of a trial and are considered technical and bothersome by a jury.'" *State v. Kaufhold*, 2020-Ohio-3835, ¶ 58 (12th Dist.), quoting *State v. Steele*, 2005-Ohio-943, ¶ 100 (12th Dist.).

{¶ 48} In this case, for example, had Holloway's trial counsel objected every time that an inadvertent slip of the tongue resulted in C.R., M.W., and C.L. being referred to as his "victims" at trial, a very real possibility exists that the jury would consider this petty and quite trivial in comparison to the gravity of the situation, thus creating an ever increasingly negative opinion of Holloway after each objection being made. *See State v. Wilson*, 2019-Ohio-338, ¶ 28 (12th Dist.) (noting that excessive objections, or objections to otherwise trivial matters, can negatively impact the jury's opinion of the defendant). It was therefore certainly within the realm of possibility that such a decision was made by Holloway's trial counsel as part of a conscientiously determined trial strategy. *See State v. Boeddeker*, 2010-Ohio-106, ¶ 20 (12th Dist.). Accordingly, because Holloway cannot demonstrate either of the two elements necessary to establish an ineffective assistance

- 21 -

of counsel claim under *Strickland*, Holloway's third argument also lacks merit.

*(4) Cumulative Error Doctrine*

{¶ 49} In his fourth assignment of error, Holloway argues the cumulative effect of his trial counsel's errors resulted in him receiving ineffective assistance of counsel. "The doctrine of cumulative error applicable to claims of ineffective assistance of counsel asks whether counsel's errors, when viewed cumulatively, show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different' even though none of the errors individually warrant relief." *State v. Nicholson*, 2024-Ohio-604, ¶ 343, quoting *Strickland*, 466 U.S. at 694. However, as noted by the Ohio Supreme Court, because none of Holloway's individual ineffective assistance claims have merit, Holloway "cannot establish a right to relief simply by joining those claims together." *State v. Dean*, 2015-Ohio-4347, ¶ 296. This is because, as discussed more fully above, Holloway either failed to establish that his trial counsel's performance was deficient, or that he was subject to any resulting prejudice therefrom. This holds true even when viewing each of his trial counsel's alleged "errors" cumulatively. *See State v. Bradley*, 42 Ohio St.3d 136, 146-147 (1989). Therefore, just as with his third argument, Holloway's fourth argument must likewise fail. Accordingly, finding no merit to any of the four arguments raised by Holloway herein, Holloway's first, second, third, and fourth assignments of error are overruled.

**Assignment of Error 6:**

{¶ 50} MR. HOLLOWAY'S CONVICTIONS WERE BASED ON LEGALLY INSUFFICIENT EVIDENCE, THEREBY DENYING MR. HOLLOWAY HIS RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.

{¶ 51} In his sixth assignment of error, Holloway argues the jury's verdict finding

him guilty of raping M.W. as alleged in Count 2 of the indictment was not supported by sufficient evidence. This is because, according to Holloway, the record is devoid of any evidence to establish Warren County as a proper venue for that offense. However, as discussed more fully above, because Holloway was alleged to have raped M.W. as part of a "course of criminal conduct," venue for Count 2 was proper in Warren County pursuant to R.C. 2901.12(H). As previously noted, that statute addresses venue when an offender commits offenses in different jurisdictions as part of a course of criminal conduct and provides, in pertinent part, that:

> [w]hen an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred.

Therefore, because venue for Count 2 was proper in Warren County pursuant to R.C. 2901.12(H), Holloway's sixth assignment of error lacks merit and is overruled.

**Assignment of Error No. 5:**

{¶ 52} MR. HOLLOWAY'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE VACATED.

{¶ 53} In his fifth assignment of error, Holloway argues the jury's verdicts finding him guilty of raping C.R. and M.W. as set forth in Counts 1 and 2 of the indictment were against the manifest weight of the evidence. We disagree.

{¶ 54} "Unlike the sufficiency-of-the-evidence standard of review," which addresses the state's burden of production, "'a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion.'" *State v. Casey*, 2024-Ohio-689, ¶ 10 (12th Dist.), quoting *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "To determine whether a conviction is against the manifest weight of the evidence, this court must look at the entire record, weigh the evidence and all reasonable inferences, consider the

credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lewis*, 2020-Ohio-3762, ¶ 18 (12th Dist.), citing *State v. Wilks*, 2018-Ohio-1562, ¶ 168.

{¶ 55} But, even then, a determination regarding the witnesses' credibility is primarily for the trier of fact to decide. *State v. Baker*, 2020-Ohio-2882, ¶ 30 (12th Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Therefore, given that it is primarily the trier of fact who decides witness credibility, this court will overturn a conviction on manifest-weight grounds "only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Kaufhold*, 2020-Ohio-3835, ¶ 10 (12th Dist.). When reviewing a jury verdict, such as the case here, this court may reverse a defendant's conviction "only when there is unanimous disagreement with the verdict." *State v. Marcum*, 2016-Ohio-263, ¶ 10 (12th Dist.), citing *State v. Gibbs*, 134 Ohio App.3d 247, 255 (12th Dist.1999).

{¶ 56} Holloway argues the jury's verdicts finding him guilty of raping C.R. and M.W. were against the manifest weight of the evidence because their "behavior" in the days, weeks, and months after the supposed rapes "contradicts their allegations" against him. However, given the record in this case, the jury was made well aware of what C.R. and M.W. did, and did not do, after they allege Holloway raped them. This included evidence that both C.R. and M.W. had attended social events where Holloway was present. But, while some may find C.R.'s and M.W.'s behavior odd, as we have stated previously, "this type of blame shifting does not resonate with this court." *State v. Jackson*, 2023-Ohio-3749, ¶ 25 (12th Dist.) (rejecting appellant's claim that his rape conviction "must be reversed because [the victim] 'never explained why she failed to seek medical attention' or 'adequately explained why she delayed contacting law enforcement'"). This

is particularly true in this case when considering Holloway had ample opportunity to cross-examine C.R. and M.W. at length as to what they were doing both immediately before and after the rapes occurred. This includes Holloway questioning C.R. and M.W. as to why they did not immediately report to the police that Holloway had raped them.

{¶ 57} However, regardless of what C.R. and M.W. may or may not have done in the time before and after being raped, the jury clearly found their testimony detailing what Holloway had supposedly done to them credible and worthy of belief. This was not error for it is well established that this court is required to give substantial deference to the trier of fact, in this case the jury, on issues involving witness credibility. *State v. Buckland*, 2023-Ohio-2095, ¶ 20 (12th Dist.). This is because "the decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *Jackson* at ¶ 26. It is equally well-established that "[a] conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony offered by the prosecution." *State v. Baker*, 2020-Ohio-2882, ¶ 31 (12th Dist.). Therefore, because the jury's verdicts finding Holloway guilty of raping C.R. and M.W. as set forth in Counts 1 and 2 of the indictment were not against the manifest weight of the evidence, Holloway's fifth assignment of error also lacks merit and is overruled.

{¶ 58} Judgment affirmed.

M. POWELL and BYRNE, JJ., concur.